## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**MELINDA MITCHELL**

                                  **CIVIL ACTION**

**v.**

                                  **NO. 13-820-JWD-RLB**

**UNIVERSITY OF LOUISIANA SYSTEM,
UNIVERSITY OF LOUISIANA AT
MONROE**

## <u>RULING AND ORDER</u>

      This matter comes before the Court on the Motion for Summary Judgment (Doc. 60) filed by Defendant, University of Louisiana System.  Plaintiff Melinda Mitchell opposes the motion. (Doc. 75.)  Oral argument is not necessary.  Having carefully considered the law, facts in the record, and arguments of the parties, the Defendant's motion is granted in part and denied in part.

### I.      Introduction

      Plaintiff Melinda Mitchell is currently an employee of the Defendant University of Louisiana System at the University of Louisiana Monroe ("ULM"). She was at all times relevant to this suit.  She is a 55 year-old African-American.  Plaintiff brings claims of discrimination on the basis of age under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"); of discrimination on the basis of race and gender under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); of retaliation under the ADEA; and of reprisal under the Louisiana Whistleblower Act, La. Rev. Stat. § 23:967.

      In short, as to the discrimination claims, Plaintiff was an employee at ULM in the University Planning and Analysis Office ("UPA Office").  When the Executive Director of the

UPA Office resigned, she sought the position.  Defendant instead hired Rusem Hemed, a 27 year old white male.

Plaintiff complains she was discriminated against because of her age, race, and gender. Defendant responds that she was unqualified because she lacked a graduate degree and that it wanted to hire a different kind of candidate to suit the UPA Office's new function.

The Court finds that genuine issues of material fact preclude summary judgment on the age discrimination claim.  A reasonable juror could conclude that Defendant's justifications were pretexts for discrimination.  Specifically, construing the evidence in a light most favorable to the Plaintiff, a reasonable juror could conclude that ULM changed the qualifications for the position to exclude the Plaintiff and that ULM's Executive Vice President made a discriminatory remark evidencing discrimination.

However, the claims of discrimination based on gender and race are dismissed.  As to the disparate treatment claim, Plaintiff has failed to bring forward competent summary judgment evidence to show pretext.  Even if the Court considered the Plaintiff's incompetent evidence, no reasonable juror would find racial or sexual discrimination.  Accordingly, these claims are dismissed with prejudice.

As to the disparate impact claim, Plaintiff has failed to exhaust her remedies. Her EEOC charge facially alleged disparate treatment, and it identified no neutral employment policy.  As a result, this claim is dismissed without prejudice.

Plaintiff also asserts claims of retaliation under the ADEA.   First, she claims that Hemed locked his personal office door, which kept her from equipment important to her job; asked her for a list of job duties and made inquiries about her job; and carbon-copied ("CC'ed") the Vice-President of ULM on one of these inquiries.  Second, Plaintiff claims that she was effectively

demoted by being transferred to the Computing Center, where she was given little to nothing to do and was required to perform menial tasks.

The first set of retaliatory acts are dismissed.  Each of these claims are petty slights and minor annoyances, and no reasonable juror would conclude that these actions would dissuade a reasonable worker from making or supporting a charge of discrimination.  These claims are consequently dismissed with prejudice.

However, the second set - transfer to the Computing Center - survives.  Contrary to Defendant's assertion, Plaintiff has exhausted administrative remedies on this claim; there is a proper charge of race and age discrimination before the Court, so the Court has ancillary jurisdiction over the retaliation claim.   Further, despite inconsistencies in Plaintiff's account, her evidence (including her sworn testimony and audio recording) creates genuine issue of material fact that this was not a lateral transfer but was instead a *de facto* demotion that would dissuade a reasonable worker from making or supporting a charge of discrimination.

Finally, the Court denies summary judgment as to Plaintiff's reprisal claim under La. Rev. Stat. § 23:967.  Louisiana law looks to federal law for its retaliation and discrimination claims.  Because there are issues of fact on the ADEA disparate treatment and retaliation claims, summary judgment is inappropriate for the state law claims.

Accordingly, Defendant's motion for summary judgment is granted in part and denied in part.  The ADEA claims of age discrimination for failure to promote and of retaliation for the transfer to the Computing Center survive.  The state law reprisal claim also survives.  However, the Title VII claims of disparate treatment are dismissed with prejudice, and the Title VII claim of disparate impact is dismissed without prejudice.  Further, the retaliation claims related to

locking the office door, asking about the job and duties, and CC'ing the Vice President are dismissed with prejudice.

## II.      Factual Background[1]

### A.  Plaintiff's Time in the UPA Office

Plaintiff worked for ULM in the early 1990s for three years, and she rejoined it on January 7, 2008. (Docs. 75-2 at 4, 60-2 at 1, and 75-1 at 1.)  On that day, she began working as an Institutional Research Programmer/Data Analyst within the UPA Office. (Docs. 60-2 at 1, 75-1 at 1.)  According to Dr. Stephen Richters, Executive Vice President of ULM, the UPA Office traditionally performed four functions:

1) Generating and submitting external reports that are required by a number of federal and state entities, each of which require specific reports of all universities;

2) Handling internal data requests received from deans, faculty, and administration;

3) Keeping a "fact book" which was a collection of information about the university, with the intention to publish sufficient data and therefore minimize requests that could be simply answered by accessing the data in the fact book; and

4) Answering any ad hoc requests from the president or the staff.

(Doc. 60-3 at 1-2.)  At the time of her hire, Mitchell reported to the Executive Director for University Planning and Analysis, who was Robin Logan from 2008 to 2009 and Justin Roy from 2009 to November 2012. (Doc. 63 at 11-13.)

---

[1] The parties' presentation of the facts is slipshod at best.  Both parties attempt to authenticate their exhibits *en masse* through the testimony of individuals who lack personal knowledge as to particular exhibits, despite being given an additional opportunity to do so. (*See* Docs. 102, 111.)  Defendant also seeks to squeeze all of its documents into the business records hearsay exception without taking into account the particulars of individual documents. (Doc. 60-4 at 3-4.)  Moreover, both parties frequently mischaracterized evidence and failed to include cited-to pages with their exhibits.  Nevertheless, because the Court's decisions rely primarily on testimony (by affidavit or deposition), sufficiently supported documents, uncontested facts, and a lack of evidence on certain issues, the Court can proceed with this ruling.  Non-authenticated evidence submitted by the parties is provided merely by way of background and context.  Exclusion of specific documents relevant to the analysis is discussed below.

Concerning Plaintiff's specific duties at UPA, Plaintiff stated in her declaration that:

> I served as a liaison between the computing center and administrative offices who deal with university information, maintaining the local records retention plan within the office, collecting, compiling and analyzing data, researching computing and composing reports, worksheets, and graphs.  I assisted with the development, updating and streamlining of office reporting procedures.  I also assisted in completion of surveys and statistical reports requested by campus departments, and state and other agencies.

(Doc. 75-2 at 280.)  As will be discussed below, Plaintiff also claims that she was acting Executive Director from November 2012 to January 2013.

## B.  Vacancy at the Executive Director Position and Minimum Qualifications

In November 2012, Executive Director Justin Roy resigned from his employment with Defendant. (Docs. 60-2 at 2, 75-1 at 2.)  At the time of his resignation, the Executive Director position reported directly to Dr. Richters. (*Id.*)

Dr. Richters testified via affidavit:

> [A]s early as in 2010 and 2011 . . . the university's need for data driven decision making in marketing, recruiting, and other areas suggested that UPA be tasked with analyzing data in addition to its traditional reporting of data.  In order to accomplish this, some of the data reporting would need to be reassigned to another area.

> . . . [W]hen . . . Roy resigned in November 2012, [the] administration made a determination to complete the changeover and to focus that department on data mining and predictive analysis, with the expectations that the department would no longer handle internal reporting and that the university "fact book" would be phased out.

> . . . [T]his shift in the focus of the UPA office had a significant impact in setting the job qualifications for the Executive Director position in replacing Justin Roy in late 2012, specifically that the new Executive Director would be expected to do data modeling and predictive analysis, do cross-checks of data production, and have a master's degree.  [Dr. Richters] was looking to hire a completely different type of candidate than the type that the university had previously hired before.

(Doc. 60-3 at 2.)

On or about November 26, 2012, Defendant posted an advertisement for the Executive Director position. (*Id.* at 2-3)  According to the Defendant, one of the minimum qualifications for the Executive Director position in 2012 was a graduate degree. (Def. Ex. H, Doc. 63-1 at 79.)

While Plaintiff admits that she does not possess a Master's degree (Doc. 75-1 at 3), she (1) asserts that she ran the department as "Interim Director" (*Id.*) and (2) denies that a graduate degree was a minimum qualification. (*Id.* at 2)

In support of the former, Plaintiff argues that, "[i]n November 2012, Ms. Mitchell served as the Interim Director of the University Planning and Analysis Office until January 2012, when Ruslan Hemed, with no seniority or experience, at age 27, was hired as the Director of the University Planning and Analysis Office[] over Mitchell, then age 53." (Doc. 75-1 at 1.) Plaintiff bases the "Interim Director" title on Hemed's deposition testimony.  Specifically, Hemed stated that his predecessor, Justin Roy, left the position on November 30, 2012, and Hemed came on in mid-January 2013. (Doc. 75-2 at 312.)  During that time, "the only full-time person in that office was Melinda Mitchell," though, as Hemed notes, "two or three weeks out of December is Christmas break." (*Id.*)  Indeed, Defendant even acknowledges in its memorandum in support that Plaintiff was "the sole UPA employee during the Executive Director vacancy." (Doc. 63 at 3.)

In support of Plaintiff's assertion that there was no graduate degree requirement, she cites to three things – an advertisement, an email from Roy, and Roy's qualifications.

First, Plaintiff submits an advertisement for the position in the "The News Stars" paper in Monroe, Louisiana, which provided:

> The University of Louisiana at Monroe seeks to hire an EXECUTIVE DIRECTOR for University Planning and Analysis.  This individual will be responsible for the compilation analysis and both internal and external reporting

of data for the university.  For additional information & where to send resume: http://www.ulm.edu/cgi-bin/hr-unclassified.pl

(Doc. 75-2 at 14-16, 113.)  Thus, Plaintiff claims that a Master's degree was not required or a qualification.

Second, Plaintiff also submits an email dated November 20, 2012, from Justin Roy to Stephen Richters.  In the email, he attached a "job description" for the Executive Director position. (Def. Ex. UU, Doc. 63-2 at 97-98.) There is no requirement of a Master's degree listed (or of any other qualification). (*Id.*)

Third, Plaintiff points to the history of the Executive Director Position.  Plaintiff testified that Justin Roy was promoted to the Executive Director position without a Master's degree, and she had the same qualifications and degree level as he did. (Doc. 75-2 at 23.)

Defendant submits a document of all former Executive Directors purportedly showing that they all had graduate degrees. (Def. Ex. F, Doc. 63-1 at 74.)  But Defendant acknowledges in its memorandum in support that "Mr. Roy did not have a Master's degree when hired, but earned his during his tenure as Executive Director." (Doc. 63 at 3.)

### C.  Plaintiff's Initial Meeting with Dr. Richters' and Her Applications to the Executive Director and System Coordinator Job

According to Dr. Richters' deposition, on December 6, 2012, he first met Plaintiff when he dropped by the UPA Office for a "short chat." (Doc. 63-1 at 68.)   He said he assured her that her job was not in jeopardy, that they were not going to close the office, and that they were going to try to find a new director as quickly as possible. (Doc. 63-1 at 69.)

Plaintiff testified that, at this meeting in the first week of December, Dr. Richters told her she had someone in mind for the position. (Doc.75-2 at 27-28.)  She stated that Dr. Richters told her "that basically - - I can't remember all the words, but it's basically I need to be a team player

7

. . . [a]nd train the person that he selected" for both the Executive Director position and the System Coordinator positions. (*Id.*)

On December 10, 2012, Plaintiff applied for the position of Executive Director (Doc.63-1 at 15-16.)  Plaintiff claims she did so based on two advertisements in The News Star, one of which was quoted above. (*See* Doc. 75-2 at 14-16.)

On or about December 10, 2012, Plaintiff also applied for the position of System Coordinator in the UPA Office. (Docs. 60-2 at 2, 75-1 at 3.)  Plaintiff did not see the position posted. (Doc. 75-2 at 25.)  However, Plaintiff testified that Dr. Richters told her that additional people were needed and that he had someone in mind for this job, so she applied and let him know that she was interested in a promotion. (*Id.*) At all times pertinent to this case, the System Coordinator position had been vacant. (Docs. 60-2 at 2, 75-1 at 3.)

### D.  Plaintiff's Rejection and Dr. Richters' "Younger" People Comment

Defendant instead hired Ruslan Hemed, a 27 year old white male, for the Executive Director position. (*See* Docs. 63 at 4; 75 at 5.)  According to a Report on Disposition of Candidates for Replacement or New Position (Def. Ex. S, Doc. 63-1 at 115), nine individuals applied, of whom three were black, six were white.  Three were deemed "late," two were deemed "less qualified than the hiree," and three (including Plaintiff) were deemed lacking the minimum qualifications. (*Id.*)  Dr. Richters attests that he considered other applicants, including Plaintiff, but "she lacked the required master's degree, she had no experience with external reporting, she had no experience with predictive data analysis and modeling, and there was nothing compelling about her work performance that would compensate for her lacking a master's degree." (Doc. 60-3 at 3.)

On January 8, 2013, Dr. Richters advised the Plaintiff that she was not receiving the Executive Director job. (Doc. 63-1 at 24). Defendant asserts that Hemed received his Master's degree in December 2012. (Def. Ex. N, Doc. 63-1 at 107.) Plaintiff denies this allegation (Doc. 75-1 at 4) but provides no citation to the record in support of this denial.

Indeed, Plaintiff notes that, according to Hemed's resume (Def. Ex. N, Doc. 63-1 at 107), he received his Master's Degree in December 2012. Thus, Plaintiff contends, as of the time of the November postings, Hemed lacked a graduate degree. Plaintiff also infers that he lacked this degree when Defendant advised her that Dr. Richters had preselected someone for the position. Additionally, Plaintiff complains that Hemed lacked knowledge of SQL, which was was an important part of the job, and that he did not know how to write queries.[2]

Plaintiff claims that Hemed received the job even though Plaintiff was "more qualified" than Hemed and had been "Interim Director" from November 2012 to January 2013. (Doc. 75-1 at 3-4.) In support of her being "more qualified," Plaintiff refers to the fact that she had been in the UPA Office for a number of years. (*See* Doc. 75-2 at 3, 6, 7.)

Additionally, the parties have differing accounts of what was said by Dr. Richters at this meeting. Dr. Richters testified via affidavit that:

> [he] discussed the issue of salary compression among certain employees, specifically that recent hires (referred to by [Dr. Richters] as 'younger employees') had not had pay raises for some time and that there were some employees who had been hired within the previous five or six years, who had not received salary increases since their initial hire. . . . [A]lthough [Dr. Richters] referred to these recent hires as "young employees," his intent was not age-related but a reference to newer employees. . . . [Dr. Richters] advised [Plaintiff] that he recognized the salary compression issue among these newer employees; . . . these newer employees were hired at relatively low pay, and that the university had not had a chance to adjust these salaries upward; and . . . upon the availability of

---

[2] Plaintiff also alleges that Dr. Richters admitted knowing nothing about how well Plaintiff performed her job. However, the cited pages (pages 10-13 of Exhibit 8 to Plaintiff's Exhibit C) are omitted from the Plaintiff's submissions. (*See* Doc. 75-2 at 307-309.)

sufficient funds, he intended to rectify the issue by prioritizing those individuals
for salary increases.

(Doc. 60-3 at 4.)  Dr. Richters said that, during this discussion, he "included plaintiff Melinda
Mitchell in this group as he felt that she too was underpaid at her current salary and wanted to
address her salary inequity as soon as the university budget allowed." (*Id.*)  Dr. Richters claims
that he "did not say, suggest, or otherwise imply that younger employees should be or would be
considered for pay raises before older employees or before plaintiff." (*Id.*)

Plaintiff, on the other hand, claims that Dr. Richters told her that he wanted "younger
folk" in the Executive Director position. (Doc. 75-1 at 3-4.)  Specifically, according to Plaintiff,
when Dr. Richters told her she did not get the position, the following took place:

> [Dr. Richters] came in and sat across the desk . . . and said that – asked me if I
> was keeping busy and I told him what I was working on. . . . And he said that the
> – that was – the person he had chosen was starting and he went off into the budget
> and salary issues.  . . . And then he said, but the people who would be considered
> for raises and promotions first on campus would be the younger folks.

(Doc. 63-1 at 24.)  When asked if Dr. Richters meant "younger" with respect to age or "younger"
in service (i.e., newer hires), Plaintiff said that he "implied" age "[b]ecause he was talking about
people on campus, and when you say 'but' and then use the rest of that, 'the younger folks.'"
(Doc. 75-2 at 30-31.)

### E.  Plaintiff's January 9, 2013, Complaint of Age Discrimination

On January 9, 2013, Mr. Hemed began his employment as the Executive Director, and,
on the same day, Plaintiff filed a complaint with ULM's Human Resources office complaining of
age discrimination. (Docs. 63-2 at 3, 75-1 at 4.)  This EEOC complaint provides a little more
detail than her deposition testimony.  Specifically, Plaintiff gave the following account of the
January 8, 2013 meeting:

Stephen Richters then told me that he had made a selection for the position and that the new hire will be on campus tomorrow (January 9) at 7:30a. They will be taking him around for introductions then over to HR to fill out his paperwork. They will be in Brown Hall around 9:00 or 9:30. He then said that the new hire would be new to the office/campus and will need to rely heavily on me to keep the office running.

Stephen Richters went on to say that he knows that I am underpaid at $38,500 and that he would like to look into having my salary reviewed by this summer. Told me that I have to understand that with the budget cuts there is just so much that can be done and that it would be highly unlike that there can be pay increases without increased funding. And with the way things have been going in recent years, things do not look good. He said that we have to be just glad that we all have jobs. He said that there are a number of folks on campus that are underpaid that do good work and are also in my salary range $35,000 to $40,000. He said even in filling the Directors [sic] job the salary is lower than he would have liked. He said that he would like to review all of these people and do what he can for all. But the ones that would need to be considered first on that list "would have to be the younger folks". I wasn't sure I had heard him correctly. But he repeated it again. The second time he added "you see". This statement and his body language insinuating that surely I must understand that the younger folks on campus should be considered for pay increases before me (an older person) was very clear. He then walked to the director's office and made small talk about how nice the rooms were and that there are plans to move UPA to the library.

…

What I would like to have underscored is that: . . .

2. Based on Stephen Richters['] claim that younger folks should be preferred over me implies that he thinks I am too old to be considered for a pay increase or promotions.

(Def. Ex. K, Doc. 63-1 at 96; Pl. Ex. A-O, Doc. 75-2 at 122) (underline in original).

Both parties acknowledge that, after January 9, 2012, Plaintiff started keeping notes and audio recordings of her interactions with Hemed, among others. (Docs 75 at 6, 63 at 5.)

### F.  Plaintiff's February 5, 2013, Complaint of Retaliation

On February 5, 2013, Plaintiff filed another complaint with Defendant's Human Resources Department. (Doc. 75-2 at 56, 124.)  Plaintiff alleged "retaliatory actions"

toward her by Ruslan Hemed. (*Id.*)   Specifically, Plaintiff alleged three retaliatory

actions:

1) After returning from a conference, Hemed "began locking the director's office door whenever he is away from Planning and Analysis both during office hours and after hours." (Doc. 75-2 at 124.)  This "in effect prohibit[ed] [her] access to material and equipment that allow [her] to do [her] job." (*Id.*)

2) Hemed told her that Dr. Richters wanted "a list from [her] detailing everything [she did] in the office; detailing how [she did] it and how much time it takes to complete every task." (*Id.*)  Further, she had to complete a list of what Justin Roy worked on and what she worked on with Roy. (*Id.*)  Plaintiff had one week to do it. (*Id.*)  Plaintiff claimed this was an "unreasonable request" that intentionally created "an onerous work environment" in that she had other projects with deadlines. (*Id.*)

3) Hemed told her that Dr. Richters and he wanted to know what part of her job involved "completing campus departments['] ad-hoc reports because they [were] planning to have [UPA] discontinue accepting these types of requests. (*Id.*)  Plaintiff claimed this was a "plan to diminish and ultimately dissolve my job duties." (*Id.*)

A detailed discussion of the facts supporting these charges will be provided below.

### G.  March 6, 2013, Audit Into Hemed's Attending Classes

On March 6, 2013, Plaintiff complained to Human Resources that Hemed was auditing a

class and that the Executive VP office was "seeking to provide Ruslan Hemed with computer job

skills he lack[ed] but skills that [were] required to perform the duties" of a Director. (Def. Ex. Y,

Doc. 63-2 at 1.) Plaintiff claimed that Hemed was allowed to audit the course "off the record and

without paying tuition."[3]

On May 1, 2013, ULM issued a report on the complaint. (Doc. 75-2 at 86, 130-142.)  The

report concluded that Hemed was attending a database application development course for which

he was not registered, had not paid tuition and fees, and had not completed and filled with the

department the appropriate application and that this violated *Employee Class Enrollment Policy*.

---

[3] Hemed denied these allegations in his deposition. (*See* Doc. 63-1 at 148-51, 169-70.)

(Doc. 75-2 at 131.)   However, the report also concluded that the "current job description for the Executive Director . . . does not appear to have the specific requirement for advanced skills with computer systems and data management that were contained in the previous job description" and that "nothing came to [the auditor's] attention to indicate that Mr. Hemed did not meet the required qualifications." (*Id.*)  The report notes that Dr. Richters was aware that Hemed was attending the class but was unaware that his attendance may have violated university policies. (*Id.* at 133.)

### H.  March 27, 2013, Complaint of Retaliation

On March 27, 2013, Plaintiff filed a third complaint with Human Resources. (Def. Ex. AA, Doc. 63-2 at 19.)  Plaintiff complained that, on March 6 and March 12, 2013, she received emails from Ruslan Hemed concerning her projects and reports, and Stephen Richters and his secretary were copied. (*Id.*)  Plaintiff said that Dr. Richters had sent him an email with instructions to document everything Plaintiff said or did in the office. (*Id.*)  Dr. Richters also instructed Hemed to copy Richters and his secretary on any email exchange between Hemed and Plaintiff. (*Id.*)  When Plaintiff asked why Dr. Richters selected her for such documentation requirements, Hemed said "they" want to move the office in a new direction. (*Id.*)   Plaintiff stated that she considered "these actions as steps taken by Richters in his process of 'building a case' to find a reason to remove [her] from [her] position." (*Id.*)  Further, singling her out for "specific" treatment was "a form of intimidation.  No instructions or questions can be asked of me unless the Executive VP knows about it.  This is retaliatory actions generated in response to my EEOC complaint filed against Stephen Richters." (*Id.*)

Defendants point to the fact that Hemed first requested the information on February 1, 2013 (Doc. 75-2 at 59) and that, as stated above, she provided it at least a month later. (Doc. 75-2 at 67.)

## I.   The Rest of the Story – May to September 2013.

From May through July 2013, four main events were occurring.  The first is the Plaintiff's transfer and alleged demotion to the Computing Center.  The second is an investigation conducted by ULM into Hemed.  The third involves ULM's evaluation of Plaintiff's complaints of discrimination and retaliation.  And the fourth is additional complaints by the Plaintiff of retaliation and mishandling of her complaint.  While the transfer to the Computing Center job and the complaints of discrimination and retaliation are the issues that are most relevant for this motion, the remaining issues are discussed for context.

### 1. Computing Center Job Part I – Initial Meeting

In May 2013, Plaintiff was first approached about a position in the Computing Center. The accounts of this initial meeting differ.

Defendant submits the affidavit of Chance Eppinette, then Interim Director of the Computing Center. (Doc. 65-2 at 1.)  According to Eppinette, on May 9, 2013, he approached Plaintiff "to discuss an opportunity in the Computing Center, specifically a position that would be responsible for handling ad hoc requests for reports for the campus and community." (Doc. 65-2 at 2.)  According to Eppinette, "plaintiff expressed her interest in the opportunity in the Computing Center and requested additional information regarding that position," but he also advised her that this meeting "was an exploratory meeting; that no specifics regarding the position were available at that time; and that he would get back with [her] with detailed information as that opportunity continued to develop." (*Id.*)

14

Plaintiff, on the other hand, testified that, shortly after May 1, Eppinette approached her and said "that they were creating a job in the computing center and he was there on Dr. Richters' instructions . . . to check or look at [her] - - how it would match up, [her] qualifications." (Doc. 75-2 at 86-87.)  The Plaintiff further said, "when Chance came over to tell me that a job was being created in the computing center . . . and that he was checking to see what my qualifications were to see if I was a fit, he said that there was a lot of work that needed to be done and that I'd have all these extra duties to be - - to do, so they wanted me to move." (*Id.* at 88.)   Plaintiff testified that she was told by a Donnie Lynn that "the reason [she] was moved over to the computing center didn't pan out and that they were trying to find something for [her] to do, basically." (*Id.* at 105.) Plaintiff argues that the position did not exist.

Plaintiff also states in her declaration that the Computing Center and UPA Office have different functions.  According to Plaintiff:

> The Computing Center provides network support, training and orientation, configuration design and hardware specifications, site license software distribution, test grading, assistance with instructional media, and web and database development.  The computing handles equipment and software support functions.  Its primary function does not include data extraction.
>
> . . . The UPA department is a division of the Executive Vice President.  Its purpose is to provide timely, accurate, and consistent information and data about ULM to all constituents, both internal to and external of the institution.  Common requests for data include: official enrollment and/or headcount for current and past terms, student profile or demographic information, enrollment and retention analysis, graduate head count and graduate rates.

(Doc. 75-2 at 285-86.)

### 2. ULM's Investigation into Plaintiff's Complaints

On May 15, 2013, Faculty & Staff Investigators issued a report addressing Plaintiff's above three complaints.  (Doc. 63-2 at 22-31.)  The report concluded that there was no age

discrimination in Hemed's hiring and no retaliatory actions against Plaintiff. (Doc. 63-2 at 29.) Based on the facts detailed above, Plaintiff denies the findings of this report.

### 3. Payroll Fraud Investigation I

On May 30, 2013, Plaintiff verbally requested an investigation into alleged payroll fraud by Ruslan Hemed. (Doc. 60-2 at 6, 75-1 at 6.)

On June 10, 2013, Plaintiff filed a written request with ULM's Department of Internal Audit. (Doc. 60-2 at 7, 75-1 at 7; Def. Ex. CC, Doc 63-2 at 32.)  Plaintiff requested an investigative audit concerning improper payroll actions by Ruslan Hemed, specifically concerning unauthorized and/or excessive absences from work. (Doc. 63-2 at 32.)  The audit involved a trip Hemed planned to take in September to Israel. (Doc. 75-2 at 78-79.)  The parties dispute the basis of Plaintiff's knowledge. (*See* Docs. 60-2 at 7, 75-1 at 7.)

### 4. Computing Center Job Part II

Plaintiff testified that, on June 10, 2013, Epinnette told her that the job was ready and that she would move the next day. (Doc. 75-2 at 89.)  Plaintiff asked for the terms to be laid out in writing. (*Id.*)  Epinnette gave her a document and told her she would have to sign it – "it didn't matter one way or the other, but I was going to have to sign it." (*Id.* at 90.)  Plaintiff reviewed the document but did not agree with its terms. (*Id.*)

According to Plaintiff's work journal, on June 10, 2013, Plaintiff spoke with Hemed. (Doc. 63-1 at 93.)  This occurred before Plaintiff filed her request for an audit of Hemed. (*Id.*) Hemed told her that he had talked with Dr. Richters and that, according to Dr. Richters, Eppinette was going to offer her a job in the computing center effective July 1. (*Id.*) Hemed said he was giving her a heads up and that he was not sure if he was supposed to tell or not. (*Id.*) Plaintiff wrote that Hemed had "struggled all weekend with the fact that [she] might not know

16

what's getting ready to happen to" her. (*Id.*)  Plaintiff also wrote, "[Hemed] [s]aid that I should be happy about this move cause 'at least you're not being fired.'" (*Id.*)

Plaintiff also records in her work journal that, on June 11, 2013, she met with Eppinette about the move to the Computing Center. (Doc. 75-2 at 225.)  "Chance told me that Dr. Richters wanted him to push forward with moving me to the computing center as soon as possible." (Doc. 75-2 at 226.)  Defendant notes that, according to the journal, Eppinette said this was a lateral move and that she would keep the same pay. (Doc. 75-2 at 226.)[4]  According to the journal, Plaintiff "[t]old [Eppinette] that [she] believe[d] this move is retaliation and that Richters was sending Chance here to convince [her] to move."  (Doc. 75-2 at 225.)[5]

### 5. EEOC Charge

At some point around this time, Plaintiff filed her EEOC charge, though the parties dispute as to when this took place.  Defendant claims that Plaintiff filed the charge on June 12, 2013 (Doc. 60-2 at 7), and Defendant appears to base this on the fact that this date appears next to Plaintiff's signature on the EEOC Charge of Discrimination form. (Doc. 63-2 at 40.)[6] Plaintiff, on the other hand, claims the form was filed on May 14, 2013 (Doc. 75-1 at 7), and she

---

[4] The issue of whether the move was lateral or a demotion is hotly contested and is discussed in more detail below.

[5] In her Opposition, Plaintiff argues that there are inconsistencies in Eppinette's testimony.  Eppinette stated in his affidavit that, "at the time that [P]laintiff . . . was transferred to the Computing Center, [he] was unaware of any complaints that plaintiff had lodged with Human Resources, Internal Audit, etc." (Doc. 60-5 at 4.) However, in the Faculty and Staff Investigation report of plaintiff's EEO Complaints of March 27, 2013, and July 1, 2012 (Pl. Ex. A-EE, Doc. 75-2 at 180), Eppinette noted that, when he met with Plaintiff in June 2013, she "disclosed that she had a pending grievance regarding issues related to her work assignment and position. . . ." (*Id.* at 183.)  Plaintiff also notes that, according to the report, the determination "that the Computing Center was the most logical workspace to be considered a central repository for data report generation" was made "earlier in the summer." (*Id.*) Plaintiff argues this contradicts Eppinette's affidavit, which states that Eppinette and Dr. Richters discussed consolidating the Computing Center and UPA Office "at various times prior to 2013." (Doc. 60-5 at 1-2.)  As these alleged inconsistencies are not material to the disposition of the motion, the Court declines to make any finding concerning them.

[6] As Defendant asserts in its Compliance with Court Notice Regarding Authenticity of Exhibits (Doc. 110), this document appears properly authenticated under the four-part test articulated in *Railroad Management Co. v. CFS Louisiana Midstream Co.*, 428 F.3d 214, 220 (5th Cir. 2005) (citing *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 562 (5th Cir. 1998)).  Indeed, Plaintiff attaches this document with her opposition to the motion for summary judgment (Doc. 75-2 at 274.)

appears to base this on the fact that Plaintiff's EEOC Intake Questionnaire is signed May 14, 2013. (Doc. 63-2 at 45.)[7]

In any event, the content of the charge will be set forth below.  In short, Plaintiff complained that she was denied the Executive Director position and that she was retaliated against. (Doc. 75-2 at 274.)  She claimed discrimination on the basis of race, sex, and age. (*Id.*)

### 6. ULM's Internal Investigation

On June 24, 2013, ULM's internal EEO Advisory Committee's Confidential Report was issued. (Doc. 63-2 at 46.)  The report examined the merits of Plaintiff's complaints of retaliation and age discrimination and concluded that they were unsupported. (*Id.* at 46-48.)  Plaintiff denies that an investigation in fact occurred, though she presents no evidence of this. (Doc. 75-1 at 7.)

### 7. Computing Center Job Part III – Plaintiff's Official Transfer

In a letter dated June 25, 2013, Eppinette told the Plaintiff that, effective July 1, Plaintiff would be reassigned from Institutional Research to the Computing Center.  (Def. Ex. HH, Doc. 63-2 at 54.)  Eppinette said that the Computing Center had been charged with developing a new data reporting group that would act as a "central repository for all things regarding requests of Banner related data and other University data repositories." (*Id.*)  Eppinette said:

> This will be a lateral move between departments and your pay remains the same at this time.  . . . I have made slight modifications to your official job description to tune it up for purposes within the Computing Center.  There may be other adjustments to the job description at this group development moves forward.

(*Id.*)

---

[7] This document also appears authenticated under *Railroad Management Co.*, particularly since Plaintiff also submitted the document. (*See* Doc. 75-2 at 276-279.)

Defendants also submit a document entitled "Payroll Action Form-M" (Def. Ex. LL, Doc. 63-2 at 59) with "Melinda Mitchell" at the top, with Eppinette and Dr. Richters' signatures at the bottom, and with the following stated: "**Action**: Dept. Transfer; Title Chge.  **Effective Date**: 7/1/2013" and "Title Change with Dept. Transfer from University Planning & Analysis to Computing Center effective 7-1-13."(*Id.*)  For the above reasons, Plaintiff denies this was a "transfer." (Doc. 75-1 at 8.)

### 8. Computing Center Job Part IV – Plaintiff's Job Duties

#### a.  Defendant's Evidence

Defendant attaches two documents (Def. Exs. II & JJ, Doc. 63-2 at 56-57) purporting to be descriptions of Plaintiff's job in the Computing Center and in University Planning and Analysis.  On paper, there are the following differences in job description:

1) The title is changed from "Institutional Research Programmer/Data Analyst" to "Programmer/Data Analyst (3889)"

2) The new job description no longer has as a duty and responsibility, "To maintain the local records retention plan within the office."

3) Her old job duty of "To collect, compile, and analyze data" was changed to "To collect, compile, and analyze data in the form of database queries and process the output as needed in reports, Argos, etc."

4) The new job description has an additional qualification and skill: "Knowledge and working use of SQL to obtain needed data points for various database formats – such as Oracle, MS-SQL, Access."

(*Id.*)  The Defendant correctly notes that no additional duties were added to the new job description. (*Id.*)

On June 25, 2013, Plaintiff sent a letter to Fred Baragona, head of Human Resources.  In the letter, she noted that she received the revised job restriction and that she "voiced [her] frustration to [him] in that the duties of this new position are greatly increased but the pay is the

same as in [her] current job." (Def. Ex. KK, Doc. 63-2 at 58)  She called the move a "demotion." (*Id.*)  She also complained that the transfer was retaliatory in that (1) her duties increased without an increase in pay, (2) she was moved into one of "the most dysfunctional work areas on campus," (3) the "new direction" mentioned by Dr. Richters "only became evident when [she] file[d] [her] complaint," and (4) the position was "created under a questionable supervisor." (*Id.*)

### b.  Plaintiff's Deposition Testimony

While Plaintiff still claims that she was "effectively demoted," She now argues, unlike her letter to Freddie Baragoda, that she was "given no work to perform." (Doc. 75-1 at 2.)  She testified that she was forced to perform menial, degrading duties such as "forms, which was the clerical, the secretary's duties. . . . As opposed to being in a position to advance to a higher level, now I'm doing things that are even below me, below the programmer analyst duties." (Doc. 75-2 at 106.)  Plaintiff was "just modifying the documents[,] . . . not creating new ones. . . . That's the skill set a secretary normally has." (*Id.* at 107.)  Plaintiff found it degrading because she believed she "was in line for an executive director's position." (*Id.*)  She also "started doing help desk functions." (*Id.* at 108.)  Plaintiff said that Donnie Lynn (her supervisor at the Computing Center) (*See* Doc. 63-2 at 54) told her that "the reason [she] was moved over to the computing center didn't pan out and that they were trying to find something for [her] to do, basically.  And he said that [they] [had] these one-offs that no one has been doing for a while and that would be something that we'll have you doing." (Doc. 75-2 at 109.)

Plaintiff also asserts that she sits through training for certain software packages for a foundation, and she has "gone over there to ask if there's any help that [she] can give them after [she sat] through the training and they [didn't] need her." (*Id.*)  So far, "there hasn't been a need" for her. (*Id.* at 110.)  Plaintiff cited two software trainings she has received which she has not

used since. (*Id.*)  Plaintiff testified, "even if I go and get the training, which I have, they're not

calling me back to come help them because they don't need it." (*Id.* at 112.)

### c.  Plaintiff's Declaration

In her declaration (Doc. 75-2 at 280), Plaintiff stated that, "As an employee in the

Computer Center, beginning on July 1, 2013, my job description reads nearly identical to my

UPA position but requests that I previously completed are now being sent to the computing

center and are forwarded to other programmers.  This leaves me with nothing to do for weeks."

(*Id.* at 281-82.)

Plaintiff also attaches a document entitled "Reporting System Tickets" (Doc. 75-2 at 287-

291) which appears to show that, in 2013, Plaintiff had 10 tickets (others in the office working a

comparable amount of months had had 9, 41, 4, and 14) and that, in 2014, Plaintiff had 23

(others in the office working a comparable amount of months had 17, 47, 46, and 10).[8]

Plaintiff's declaration also describes seven "one-off" projects from October 2013 to May

2015.[9]  Plaintiff makes various complaints about them.  For instance, the October 2013 project

was described as "not a programming project.  Donnie Lynn asked me to pull and forward copies

---

[8] Defendant objects to this Exhibit 1 as not being produced in discovery.  Plaintiff responds that this document is a
Fed. R. Evid. 1006 summary of ULM's own documents and that an earlier version of this document was produced in
discovery.
  The objection is overruled.  Rule 1006 summaries can be proper summary judgment evidence. *See  F.T.C. v.
Hughes,* 710 F. Supp. 1520, 1524 (N.D. Tex. 1989).  Further, a Rule 1006 summary "need not have been produced
during discovery." *Mack v. Benjamin,* No. 13-552, 2015 WL 7313869, at *2 (M.D. La. Nov. 20, 2015) (citations
omitted).  While there is no showing here that the Plaintiff made the originals available for examination or copying
by Defendant at a reasonable time and place, this showing appears unnecessary here, as the documents are in
Defendant's custody.  While Defendant perfunctorily says the summary is unreliable (Doc. 97-1 at 2.), it makes no
real showing of why.  Finally, while Defendant claims prejudice, it had notice that these documents would be used,
as Defendant admits this was merely an updated version of an earlier document provided to it.  Thus, this document
is admissible.
[9] Defendant makes several objections to Plaintiff's use of facts occurring after the date of the amended complaint.
Without detailing each specific objection, the Court rejects this argument.   Most of the facts at issue involve one
claim – her alleged retaliatory transfer to the Computer Center.  The central issue with respect to this retaliatory
action is whether she was stripped of job duties and given nothing to do.  The facts cited by Plaintiff here are merely
evidence offered in support of that one claim of retaliation, which was set forth in the amended complaint, and
offered to prove that she continued to have nothing to do.  The remainder of these objections are dealt with
elsewhere.

of all of the computing center web forms saved in .pdf format and he would convert them to Word documents.  Once modified by him, I was to give them to an administrative assistant for edits." (Doc. 75-2 at 282 n. 1).  According to Plaintiff, "Donnie Lynn insisted that revising computing center forms as 'something for me to do.'" (*Id.*)  In the December 2013 project, Plaintiff supposedly "pulled one list of graduate students from the software on March 18, 2004. No other work was ever done on this project.  Alumni Director Susan Chappell said that the Alumni group did not need my assistance." (*Id.* at 282 n. 2.)[10]   For others, Plaintiff either worked initially on something or met with others to begin working, and nothing came happened afterward. (*See id.* at 282 n. 3-5.)

### d.  Plaintiff's Work Performance Plan

Plaintiff also attaches to her declaration a "Performance Expectation Plan" dated May 14, 2015. (Doc. 75-2 at 296.)  Defendant objects to this document as not having been previously produced. Plaintiff responds that it was in Plaintiff's custody and that the Plaintiff identified "performance evaluations" in her initial disclosures.  Plaintiff argues that, for the first time in the evaluation, "ULM attempts to rate and assign tasks to Mitchell . . . tasks which Mitchell attests are bogus."  (Doc. 96 at 6.)  The Court finds that, even if this document were timely produced, it is irrelevant and is thus excluded.

---

[10] Plaintiff supports this statement with an email.  (Doc. 75-2 at 292-95.)  Defendant objects that this string was not produced in discovery.  Plaintiff responds that it was, though she does not produce evidence supporting this. Defendant responds that it was not.  Faced with this impasse, the Court declines to review this exhibit.  Ultimately, the issue is inconsequential.  The Plaintiff declares that an ULM employee said she did not need Plaintiff's help. This sworn statement by Plaintiff suffices for present purposes.

### e.   Hemed's Testimony

Plaintiff also points to some of Hemed's testimony.  Specifically, Hemed testified that, after Plaintiff was reassigned to the Computing Center, ULM provided him with a graduate assistant to work at the UPA Office. (Doc. 75-2 at 313-314.)

### f.   Plaintiff's Audio Recording

Finally, Plaintiff also submits several audio recordings.  Most significantly, at the beginning of one such audio recording, which involved a conversation taking place after the transfer, Plaintiff appears to be discussing one of her work assignments with Donnie Lynn. (Pl. Ex. 7, Doc. 75-2 at 306, Oral Recording 2014 08 28 CC.) Plaintiff asks her boss about why he reassigned one of her projects, but he responds that it was not reassigned; rather it was used as a training exercise for a new programmer. (*Id.*) While Lynn informed her that he liked her coworkers work "a little better" because it was a little more "fleshed" out, she was told that "there was nothing wrong with [hers], everything [she] did was correct based on the criteria [he] gave her." (*Id.* at 1:37-1:48.)

Lynn related to her that "it's a standard practice in the programming world for the new person … is to give them something somebody else has already done that you know is working that is functional that is there, to see what they're doing." (*Id.* at 2:57.) Plaintiff responded that she "didn't get that." (*Id.* at 3:12.) Lynn told her that he knew she didn't get that, but that it was not needed for her to be told what he was assigning to another person.  (*Id.* at 3:30.)

Plaintiff then asked "Why? Because I have not…I'm not a programmer, I was brand new and this would be training for me to know how things work … [inaudible] … it would have been

great for me when I first came over here because we were just doing analysis at our old job." (*Id.*

at 3:28.) In response, the following conversation occurred:

> Lynn: We're looking at different things for you because the reporting aspect has
> not grown the way we thought it would grow. And that's what we're looking at
> now is … why we're trying to get you involved in some of these third party
> products is because we have to have that knowledge. We've been tasked by on
> high to have that knowledge in the computing center. The reporting aspects have
> not grown the way we thought they would.
>
> Plaintiff: So, am I going to stay here…
>
> Lynn: As far as I know…
>
> Plaintiff: … because if there's no reporting to be done or [inaudible] to do, that
> means that I have nothing to do.
>
> Lynn: Well, that's the reason why … again
>
> Plaintiff:  Not here, anyway. Somewhere else, but not here.
>
> Lynn: Well that's the reason why we're trying to get you involved in these third
> party products and helping out with those. Because … that thing is growing,
> especially on the academic side. The number of third party products that are
> hosted off site … the number of them are growing, and as we well know
> academics is a high turnover area…

(*Id.* at 3:49 – 4:51.)

Later in the conversation, Lynn told Plaintiff that they have been "fighting out" for the

last couple of months trying to figure out how to rearrange various aspects of everyone's job and

that they were "tweaking everyone a little bit." (*Id.* at 20:45.) Lynn then informed Plaintiff:

> Unfortunately, my fault, you fell to the… you were not informed of everything
> and you sort of fell to the wayside and I was trying to juggle too many things, I
> mean that's part of what's … I'm trying to shift some of my responsibilities of the
> day to day things to other people.

(*Id.* at 21:12.)

### 9. July 1, 2013 Complaint of Retaliation

Returning to the chronology, on July 1, 2013, the same day as the "transfer" to the Computing Center, Plaintiff filed another complaint to Human Resources.  (Doc. 63-2 at 60.)  In short, she claimed that the move to the Computing Center was retaliation for her outstanding EEOC complaint. (*Id.*)  Plaintiff said Dr. Richters "forcefully move[d] her to a hostile work environment and greatly increased [her] job duties without salary compensation" and that this was "punishment for speaking out concerning his discriminatory actions." (*Id.*)

### 10.        Reports and Investigations

In a letter dated July 11, 2013, the ULM President advised Plaintiff that the EEO Advisory Committee reviewed her January 9, 2013 complaint against Dr. Richters and her February 5, 2013, complaint against Hemed. (Def. Ex. GG, Doc. 63-2 at 49.)  The President provided the report, which rejected Plaintiff's complaints of age discrimination and retaliation. (*Id.* at 51.)  The President stated that he concurred with the findings of the Committee and considered the matter closed. (*Id.* at 49.)  Plaintiff denies there was an investigation but offers no proof to support this.

In a document dated July 12, 2013, Plaintiff stated that she met with ULM investigators concerning her age discrimination complaint. (Def. Ex. NN, Doc. 63-2 at 62.)  Plaintiff stated that she told the investigators she had prepared a retaliation complaint document dated March 27 for filing in Human Resources. (*Id.*)  Plaintiff said they took the document, yet the EEO Advisory Committee's Confidential Report referenced an "alleged second retaliation complaint" as not being filed.  (*Id.*)  Plaintiff subsequently re-submitted it. (*Id.*)  Plaintiff testified that, after July 11, the investigators asked her "to prepare some supplement [sic] information that went into the July 1st, but [she] didn't file another [complaint]." (Doc. 75-2 at 98.)  Rather, she filed this

"complaint" because the March 27 complaint had not been filed. (*Id.* at 99.)  Plaintiff gave the complaint to the investigators in the meeting, who said they would take it and add it to the age discrimination complaint. (*Id.*)

On July 29, 2013, Fred Baragona sent to the EEOC a response to the June 12, 2013, "Charge of Discrimination." (Def. Ex. OO, Doc. 63-2 at 66.)  In the document, Baragona said that "Dr. Richters denies making any statement regarding 'younger folks', as well as Ms. Mitchell's interpretation of the conversation they had regarding compensation and potential pay adjustments." (*Id.*)  ULM expressly denied discrimination or retaliation for the February 5 and March 27 complaints. (*Id.*)

In an email chain dated August 19, 2013, from an HR employee to Plaintiff (Def. Ex. PP, Doc. 63-2 at 68), an HR employee told Plaintiff that Fred Baragona talked to Dr. Richters about Hemed's alleged improper payroll activities and that Dr. Richters talked with Hemed. (*Id.*)  "The matter has been handled by Dr. Richters." (*Id.*)  Plaintiff denies that the complaint was handled but offers no evidence.

According to a different email chain (Def. Ex. QQ, Doc. 63-2 at 71-73), on August 22, 2013, Plaintiff sent another inquiry about Hemed's alleged improper usage of annual leave. (*Id.* at 72.)  Fred Baragona responded that he understood that Mitchell had been contacted by others and himself about a personnel matter and that "We cannot discuss personnel matters with you." (*Id.*)  On August 23, 2013, Plaintiff responded to Baragona detailing her efforts to get answers. (*Id.* at 71.)

On August 21, 2013, the EEOC issued a Dismissal and Notice of Rights informing Plaintiff of the EEOC's determination that, based upon its investigation, "the EEOC [was]

unable to conclude that the information obtained establishes violations of the statutes." (Def. Ex. RR, Doc. 62-2 at 74)

On September 25, 2013, Faculty and Staff Investigators issued a report addressing Plaintiff's EEO Complaints dated March 27, 2013, and July 1, 2013. (Def. Ex. SS, Doc. 63-2 at 75.) The report concluded that there was no retaliation or hostile work environment. (*Id.* at 82.) Plaintiff, of course, denies the conclusions of the report. (Doc. 75-1 at 9.)

On May 18, 2013, Plaintiff filed a verified Petition in the 19th Judicial District Court, Parish of East Baton Rouge. (Doc. 1-2.)  On December 23, 2013, the action was removed to this Court. (Doc. 1.)  On June 15, 2015, Defendant filed the instant motion.

### III.    Summary Judgement Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ... [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586–587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the

evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

## IV.   Discussion

### A.  ADEA Claim of Discrimination

#### 1. ADEA Generally

"The Age Discrimination in Employment Act (ADEA) prohibit[s] employers from discharging or otherwise discriminating against any individual because of his or her age." *Palacios v. City of Crystal City, Tex.*, -- F. App'x. ---, No. 14-51176, 2015 WL 4732254, at *3 (5th Cir. Aug. 11, 2015) (citations and quotations omitted).  "Under the ADEA, it is unlawful for an employer 'to discharge any individual or otherwise discriminate against any individual ... because of such individual's age.'" *Id.* (quoting 20 U.S.C. § 623(a)(1)).  "To establish a claim under the ADEA, '[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision.' " *Id.* (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009)).

The parties spar over the correct burden and the meaning of *Gross.*  In short, Plaintiff argues that, while age must be the "but-for" cause, it need not be the only reason as long as age "actually played a role in that process and had a determinative influence on the outcome." (Doc. 75.)  Defendants claims this is "absolutely inconsistent" with the definition of 'but-for.'" (Doc. 80 at 8.)

The Court finds that both parties miss the mark.  As the Fifth Circuit recently explained:

In *Gross,* the Supreme Court held that a plaintiff alleging age discrimination under the ADEA has the burden of proving that age was the "but-for cause" of the

adverse employment action, such as the discharge or failure to hire. *See* 557 U.S. at 176, 180, 129 S.Ct. 2343 (quotation marks omitted). The Court interpreted the ADEA's statutory language pertaining to the nonfederal sectors, which proscribes discrimination "*because of* such individual's age." *Id.* at 176, 129 S.Ct. 2343 (citing 29 U.S.C. § 623(a)(1)) (emphasis in original). The Court concluded that the ordinary meaning of "because of," based on prior precedent, is that a given basis is the "but-for cause," meaning that "age was the 'reason' that the employer decided to act." *Id.* (citing *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) *see also Hazen,* 507 U.S. at 610, 113 S.Ct. 1701 ("Whatever the employer's decisionmaking process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process *and had a determinative influence on the outcome.*" (emphasis added))).

*Gross* contrasted the ADEA with Title VII, which requires that a plaintiff prove that the prohibited basis—*i.e.,* race, color, religion, sex, or national origin—was a "motivating factor" in the challenged employment decision. *Id.* at 174, 129 S.Ct. 2343 (citing 42 U.S.C. § 2000e–2(m) (stating that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice")) (other citations omitted). When a plaintiff asserts multiple bases for an employer's decision, *i.e.,* where "other factors motivated the [employment] practice," 42 U.S.C. § 2000e–2(m), those actions are known as "mixed-motive" cases. *See Gross,* 557 U.S. at 171, 129 S.Ct. 2343 (defining "mixed-motive" cases as "when an employee alleges that he suffered an adverse employment action because of both permissible and impermissible considerations" (citation omitted)). The *Gross* Court observed, "[u]nlike Title VII, the ADEA's text does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor." *Id.* at 174, 129 S.Ct. 2343. Accordingly, the "but-for" standard of proof is more demanding than the "motivating factor" standard of proof. As the question presented to the *Gross* Court was whether a plaintiff must present direct evidence of discrimination in order to obtain a mixed-motives jury instruction, the Court concluded that "a mixed-motives jury instruction is never proper in an ADEA case." *Id.* at 169–70, 129 S.Ct. 2343.

*Leal v. McHugh*, 731 F.3d 405, 411 (5th Cir. 2013).  In finding that the district court erred in

dismissing a complaint that asserted two reasons for the plaintiff's failure to obtain a position

(one related to age and one not), the Fifth Circuit explained:

By dismissing Appellants' complaint on the basis that they "have asserted a mixed-motive case, which is prohibited," the district court misread *Gross*, since "but-for cause" does not mean "sole cause." *See* Black's Law Dictionary 250 (9th ed. 2009) (defining "but-for cause" as "[t]he cause without which the event could

not have occurred—[a]lso termed actual cause; cause in fact; factual cause "); *id.* (defining "sole cause," in relevant part, as "[t]he only cause that, from a legal viewpoint, produces an event or injury"); *Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1278 (10th Cir. 2010) (holding that *Gross* does not place "a heightened evidentiary requirement on ADEA plaintiffs to prove that age was the sole cause of the adverse employment action"). In *Jones*, the Tenth Circuit rejected the employer's argument that, under *Gross*, " 'age must have been the only factor' in the employer's decision-making process." *Id.* at 1277. The Tenth Circuit reasoned instead that "an employer may be liable under the ADEA if other factors contributed to its taking the adverse action, as long as 'age was the factor that made a difference.' " *Id.* at 1277. We find the reasoning of *Jones* persuasive.

*Id.* at 415. Accordingly, the court will apply this standard: Plaintiff must prove that age was "the cause without which the event could not have occurred," or that age was "the difference."

Additionally, a plaintiff may prove her case by either direct or circumstantial evidence. *Palacios*, 2015 WL 4732254, at *3. The burdens differ according to whether the evidence is direct or circumstantial. *See id.*

Here, Plaintiff contends that Dr. Richters' "younger folks" comment is direct evidence of discrimination, entitling her to that burden. Defendant disagrees. The issue turns on whether the statement satisfies the Fifth Circuit' four-part test for discriminatory remarks. *See id.* at *7 (citations omitted).

The Court need not decide this issue. Because Plaintiff has demonstrated that a reasonable jury could find age discrimination based on circumstantial evidence, the Court denies summary judgment on Plaintiff's age discrimination claim.

## 2. Circumstantial Evidence

The Fifth Circuit has recently explained:

A plaintiff relying on circumstantial evidence must prove her claims under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). She must put forth a prima facie case, at which point the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for the employment decision. If the employer provides a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to prove that the employer's proffered reason was not true—but was instead a

pretext for age discrimination—or that, even if the employer's reason is true, [s]he was terminated because of h[er] age. At the summary judgment stage, the question is whether the plaintiff has shown that there is a genuine issue of material fact as to whether this reason was pretextual. A plaintiff may show [a genuine issue of material fact regarding] pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence.

*Palacios*, 2015 WL 4732254, at *3 (internal citations and quotation marks omitted).

In short, Defendant attacks Plaintiff's claim on two grounds. First, Defendant argues that there is no prima facie case because the Plaintiff was not qualified. Second, the Defendant argues that, even if she were qualified, Plaintiff has failed to establish pretext. The Court will examine each of these in turn.

### a.   Prima Facie Case: Qualification

To establish a prima facie case, Plaintiff must show that (1) she was denied a promotion; (2) she was qualified for the position; (3) she was within the protected class (over 40 years old); and (4) someone outside the protected class with the plaintiff's qualifications received the position. *See Rachid v. Jack In The Box, Inc.,* 376 F.3d 305, 309 (5th Cir. 2004). Here, Defendant only contests the second requirement.

### i.   Parties' Arguments

Defendant argues that Plaintiff was not qualified for the position. Defendant focuses solely on the fact that Plaintiff did not have a graduate degree.

As stated above, Plaintiff has two grounds for claiming she was qualified. First, Plaintiff responds that there was no graduate degree requirement because 1) Roy did not have a graduate degree when he was hired, and Hemed did not have a graduate degree when he applied for the position; 2) Roy sent a description of the job to Dr. Richters, and this description mentioned no

graduate degree requirement; and 3) the newspaper advertisements did not mention a graduate

degree requirement.  Second, Plaintiff asserts that she ran the department as "Interim Director."

Defendant responds that 1) all prior Executive Directors had graduate degrees, and, even

if it was not a requirement before, it was when Plaintiff applied; 2) the Roy description is not

exhaustive or controlling; 3) the qualifications for the position did not change after Plaintiff

applied for the position; and 4) Plaintiff was never the "Interim Director" and did not run the

department.

ii.    Analysis

Construing the evidence in a light most favorable to the Plaintiff, the Court finds that

Plaintiff has satisfied her burden of proving that she was qualified for the position.  At the very

least, there are questions of fact on this issue because a reasonable juror could conclude that the

qualifications were changed to exclude the Plaintiff.

First, and most convincingly, the evidence in the record demonstrates that Justin Roy did

not have a graduate degree when he became Executive Director.  Plaintiff testified that Justin

Roy was promoted to the Executive Director position without a Master's degree, and she had the

same qualifications and degree level as he did. (Doc. 75-2 at 23.)  Defendant even concedes in its

memorandum in support that "Mr. Roy did not have a master's degree when hired, but earned his

during his tenure as Executive Director." (Doc. 63 at 3.)

The second reason why Plaintiff has satisfied her burden is because she has shown,

through Hemed's testimony, that she was the sole person employed in the department between

November 30, 2012 and mid-January 2013. (Doc. 75-2 at 312.)  Indeed, Defendant again admits

in its memorandum in support that Plaintiff was "the sole UPA employee during the Executive

Director vacancy." (Doc. 63 at 3.)  While the title "Interim Director" was never used by Hemed,

32

a reasonable jury, construing the facts in a light most favorable to Plaintiff, could infer that, regardless of title, she was in charge of the office during that time.

Third, Plaintiff testified that, at a meeting in the first week of December, Dr. Richters told her she had someone in mind for the position and "that basically - - I can't remember all the words, but it's basically I need to be a team player . . . [a]nd train the person that he selected" for the Executive Director position. (Doc.75-2 at 27-28.)  Again construing the facts in a light most favorable to the Plaintiff, a reasonable inference from this fact is that the Plaintiff was already qualified for the position; otherwise, she would have no ability to train the new hire.

Thus, based on these facts and reasonable inferences from them, a reasonable juror could conclude that Plaintiff would have qualified for the position had the qualification not changed to exclude her. *See Mendoza v. Reno,* No. EP-00-CA-008-DB, 2001 WL 681297, at *8 (W.D. Tex. Jan. 11, 2001) (finding prima facie requirement of qualification was met "[b]y a slender margin" when "Plaintiff could show that but for the fact that Defendant changed the position's qualifications to technically eliminate Plaintiff, Plaintiff would be qualified"); *cf. Halcomb v. Off. of Sen. Sergeant-at-Arms of U.S. Sen.*, 563 F. Supp.2d 228, 248-49 (D.D.C. 2008), *aff'd sub nom. Halcomb v. Off. Of Sen. Sergeant-at-Arms*, 368 F. App'x 150 (D.C. Cir. 2010) (unpublished) (holding in retaliation case where plaintiff alleged a failure to promote, which required proof of qualification for the position, that, "absent any showing that the degree requirement was added as a pretext for the sole purpose of denying the plaintiff the opportunity to acquire the position, the plaintiff has failed to satisfy a critical element needed for a prima facie case of retaliation" (citation omitted)).

Defendants make a number of arguments as to why Plaintiff was not qualified.  The Court rejects each of these.

First, Defendants submit a document of all former Executive Directors purportedly showing that they all had graduate degrees. (Def. Ex. F, Doc. 63-1 at 74).  Even if this document were properly authenticated (and it does not appear to be), it does not support Defendant's position; just because all former Executive Directors had a graduate degree does not mean that this was a requirement for the job.  Indeed, Justin Roy's hire demonstrates that this was not the case.  Further, a reasonable juror could infer the obvious from the document – that ULM knew the Plaintiff's degree (and therefore lack of a graduate degree), and that imposing the requirement would exclude her.

Defendant also argues, in another context, that Dr. Richters posted the job requirement in November (purportedly before he met Plaintiff) and that the Plaintiff did not express any interest in or apply for the job until December.  However, Defendant obviously was aware of the Plaintiff's lack of a graduate degree, and a reasonable juror could infer this.[11]  Another reasonable inference is that the Defendant knew that the Plaintiff (who was at that time the sole remaining member of the UPA Office and who had been there for several years) may be interested in advancing to the head of that office. Thus, Defendant's argument is defeated by logical inferences from obvious facts.

Defendant also submits a number of exhibits with its reply (specifically, Exhibits XX, YY, and CCC) to rebut Plaintiff's claim that she ran the OPA Office.  The Court declines to consider these.  The Eastern District has explained:

> Courts in the Fifth Circuit have found that a court need not consider new arguments raised for the first time in a summary judgment reply brief. *See Doe ex rel. Doe v. Beaumont Independent School District*, 173 F.3d 274, 299 n. 13 (5th Cir. 1999) (citing cases). However, a court may consider new evidence introduced in a reply brief if the non-movant is given an adequate opportunity to respond. *See Vais Arms, Inc. v. Vais*, 383 F.3d 287, 292 (5th Cir. 2004). In exercising

---

[11] Indeed, had it been properly authenticated, Defendant's own document (Def. Ex. F, Doc. 63-1 at 74), which lists all individuals within the UPA Office from 2001 to 2013, along with their degrees, confirms this.

> discretion to consider new evidence, the circumstances of the case, such as its
> timing and the existing litigation posture, may be a factor. *See In re e2
> Communications, Inc*., 320 B.R. 849, 860 n. 11 (Bankr.N.D.Tex., 2004) (failing to
> consider new evidence submitted with reply brief, where brief was submitted two
> days before summary judgment hearing, and Trustee filed a motion to strike the
> reply).

*Elwakin v. Target Media Partners Operating Co. LLC*, 901 F. Supp. 2d 730, 745-46 (E.D. La.

2012).  Given the fact that this case is on the eve of trial, the Court cannot give the Plaintiff an

adequate opportunity to respond to these exhibits.  Moreover, the Court has reviewed these

documents, and, even if it were to consider them, they simply create further issues of fact.

Accordingly, the Court concludes that Plaintiff has, at the very least, created a genuine

issue of fact as to whether she was qualified for the position.  The Court thus proceeds to the next

step in the *McDonnell Douglas* framework.

### b.   Legitimate Nondiscriminatory Reason for Not Hiring

As stated above, the "burden shifts to the employer to provide a legitimate,

nondiscriminatory reason for the employment decision." *Palacios*, 2015 WL 4732254, at \*3

(citation omitted.)  "The defendant's burden in this second step is met by producing evidence

which, '*taken as a true*, would *permit* the conclusion that there was a nondiscriminatory reason

for the adverse action." *Juneau v. Quality Christmas Tree, Ltd*., No. CIV.A. H-13-2535, 2014

WL 3796406, at \*2 (S.D. Tex. July 30, 2014) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S.

502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (emphasis in original)).

Defendant has pointed to two pieces of evidence.  The first is a transcript of an interview

taking place between certain investigators of the EEOC complaint and Dr. Richters.  According

to the notes, Dr. Richters said that he "needed someone that would be able to change gears and

do data modeling and predictive analysis", so he was "looking for a completely different

individual than the type [they] had hired before." (Doc. 63-1 at 120.)  Richters further stated that

35

he "required a master's degree because typically that position always had one" and because

"when you deal with someone from the academic side, having a master's degree makes it more

comfortable for that person to deal with." (*Id.* at 120-21.)

The Court finds that Dr. Richters' statements to the EEOC investigator are not competent

summary judgment evidence.  As one district court recently explained:

> In this circuit, however, while EEOC findings and reports are generally
> admissible evidence, documents in the EEOC file are not admissible absent an
> independent hearsay exception. FED. R. EVID. 803(8)(A)(iii) (delineating a
> hearsay exception for the "factual findings from a legally authorized
> investigation"); *McClure v. Mexia Indep. Sch. Dist.*, 750 F.2d 396, 400 (5th Cir.
> 1985) ("EEOC determinations and findings of fact, although not binding on the
> trier of fact, are admissible as evidence in civil proceedings.... However, neither
> under the [circuit] precedents nor under Rule [803(8)(A)(iii) ] is the entire EEOC
> file admissible"); *see also Cruz v. Aramark Servs.*, Inc., 213 F. App'x 329, 332
> (5th Cir. 2007) (holding that otherwise inadmissible EEOC statements and
> documents are only considered if they satisfy a hearsay exception).

*Juneau*, 2014 WL 3796406, at *3 (excluding EEOC investigator's notes as inadmissible

hearsay).  Here, Defendant's statements to the EEOC investigator constitute inadmissible

hearsay, and the Defendant points to no hearsay exception to make the documents admissible.[12]

However, Stephen Richters' affidavit (Doc. 60-3), which is admissible, does provide

some of the same information:

> [W]hen UPA Executive Director Justin Roy resigned in November 2012,
> administration made a determination to complete the changeover and to focus that
> department on data mining and predictive analysis, with the expectations that the
> department would no longer handle internal reporting and the university "fact
> book" would be phased out.
>
> . . . [T]his shift in the focus of the UPA office had a significant impact in setting
> the job qualifications for the Executive Director position in replacing Justin Roy

---

[12] As alluded to above, Defendant attempts to use for this interview transcript the business records exception of Fed. R. Evid. 803(6).  Human Resources head Fred Baragona attests that this document was "made at or near the time by, or from information transmitted by, a person with knowledge, kept in the court of regularly conducted business activity and that it was the regular practice of that business activity to make" it.  (Doc. 60-4 at 3.)  However, Defendant does not identify who this person is or, more importantly, how a transcript of an EEOC interview would be made by a ULM employee in the ordinary course of business.  Without more, the Court declines to find this hearsay exception applicable.

in late 2012, specifically that the new Executive Director would be expected to do data modeling and predictive analysis, do cross-checks of data production, and have a master's degree.  Affiant was looking to hire a completely different type of candidate than the type that the university had previously hired before.

(Doc. 60-3 at 2.)  In sum, the first nondiscriminatory justification was the Defendant's was seeking a different type of candidate because of a desire to shift the focus of the UPA office.

The second justification was that Hemed was better qualified than the Plaintiff because he possessed a graduate degree.  (*See* Doc. 60-3 at 2.)  This is detailed above.

The Court finds that the Defendant has satisfied its burden of production.  The next question is whether Plaintiff has demonstrated that these two reasons are pretexts for age discrimination.

### c.  Pretext

"At [the final] step of the *McDonnell Douglas* analysis, an ADEA plaintiff must prove that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 476 (5th Cir. 2015) (citations and quotations omitted). "At the summary judgment stage, the question is whether the plaintiff has shown that there is a genuine issue of material fact as to whether this reason was pretextual." *Palacios*, 2015 WL 4732254, at *3 (citation omitted). "A plaintiff may show [a genuine issue of material fact regarding] pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Id.* (citation omitted).  The key issue with pretext is whether the employer's justification, "even if incorrect, was the real reason for the plaintiff's termination. A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Goudeau*, 793 F.3d at 476. (citations, quotations, and alterations omitted).  "At the end of the day, the pretext

inquiry asks whether there is sufficient evidence demonstrating the falsity of the employer's explanation, taken together with the prima facie case, to allow the jury to find that discrimination was the but-for cause" of the failure to promote. *See id.* at 478.

The Court finds that Plaintiff has sustained her burden of showing that Defendant's stated reasons are a pretext for discrimination.  The Court bases this conclusion on Dr. Richters' "younger folks" comment, the change of the graduate degree requirement, and the prima facie case (which, other than the qualification prong, is uncontested).

First, the Court agrees with the Plaintiff that Dr. Richters' "younger folks" comment was evidence of discrimination.  "Remarks by a supervisor showing discriminatory animus may be utilized by a plaintiff to demonstrate pretext." *Goudeau*, 793 F.3d at 477 (citation and quotations omitted). "This makes sense as the pretext inquiry is asking the ultimate question whether a jury could find discrimination caused" the adverse employment action. *See id.* (citation omitted).

The Fifth Circuit has explained:

In a circumstantial case . . . , in which the discriminatory remarks are just one ingredient in the overall evidentiary mix, we consider the remarks under a more flexible standard. To be relevant evidence considered as part of a broader circumstantial case, the comments must show: (1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker.

*Id.* at 475-76 (finding that comments by supervisor about "old farts" and about employee wearing "old man clothes" "easily meet this less stringent standard") (citations and internal quotations omitted); *see also Machinchick v. PB Power, Inc.,* 398 F.3d 345, 353 (5th Cir. 2005) (holding that vice president's e-mail announcing the continuation of his "recruiting plan" to "strategically hire some younger engineers and designers to support and be entered by the current staff," along with "age stereotyping remarks" such as claiming an employee had a "'low

motivation to adapt' to change" and describing him as "inflexible," "not adaptable," and possessing a "business-as-usual attitude," was evidence of discrimination).

The Court finds that the Plaintiff meets this standard.  As stated above, the Plaintiff testified that, when Dr. Richters told her she did not get the position, the following took place:

> [Dr. Richters] came in and sat across the desk . . . and said that – asked me if I was keeping busy and I told him what I was working on. . . . And he said that the – that was – the person he had chosen was starting and he went off into the budget and salary issues.  . . . And then he said, but the people who would be considered for raises and promotions first on campus would be the younger folks.

(Doc. 63-1 at 24.)  When asked if Dr. Richters meant "younger" with respect to age or "younger" in service (e.g., new hires), Plaintiff said that he "implied" age "[b]ecause he was talking about people on campus, and when you say 'but' and then use the rest of that, 'the younger folks.' " (Doc. 75-2 at 30-31.)  A reasonable juror could conclude that this comment showed a discriminatory animus, and the remark was certainly made by the individual primarily responsible for the challenged employment decision.

Defendant hotly contests Plaintiff's interpretation of these remarks and their meaning. However, at the summary judgment stage, the Court must construe this evidence in a light most favorable to the Plaintiff.  Doing so, the Court finds that this statement is evidence of pretext. Indeed, Defendant's justifications are precisely why this issue needs to go before a jury.

Second, as explained above, the Plaintiff has presented sufficient evidence from which a reasonable juror could conclude that a graduate degree only became a requirement to exclude the Plaintiff.  This is further evidence that the Defendant's explanation is unworthy of credence.

And third, the Court finds that the *prima facie* evidence, which is (other than the qualification prong) uncontested, demonstrates that the Defendant's explanations are not the real reasons for the decision to hire Hemed.

Based on these three issues, the Court finds that the Plaintiff has shown a genuine issue of fact with respect to whether age was the but-for cause of the Defendant's decision not to promote the Plaintiff. Accordingly, summary judgment on Plaintiff's disparate treatment claim is denied.

### B. Title VII Claims

#### 1. Title VII Generally

The Fifth Circuit has explained:

> Title VII creates a federal cause of action for two largely separate theories of discrimination, disparate treatment and disparate impact. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Disparate-treatment discrimination addresses employment actions that treat an employee worse than others based on the employee's race, color, religion, sex, or national origin. In such disparate-treatment cases, proof and finding of discriminatory motive is required. *Id.*

> Disparate-impact discrimination, on the other hand, addresses employment practices or policies that are facially neutral in their treatment of these protected groups, but, in fact, have a disproportionately adverse effect on such a protected group. *Hebert v. Monsanto,* 682 F.2d 1111, 1116 (5th Cir. 1982). In disparate-impact cases, proof or finding of discriminatory motive is not required. *Id.* The defendant, however, can rebut a prima facie showing of disparate impact by proving that the challenged policy is a business necessity. *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 853–54, 28 L.Ed.2d 158, (1973).

*Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006). Defendant seeks dismissal of Plaintiff's disparate treatment and disparate impact claims.

The Court finds that the Defendant is entitled to summary judgment on each of these claims. First, as to the disparate treatment claim, Plaintiff has failed to demonstrate an issue of fact concerning pretext; no reasonable juror could conclude that she was denied a promotion on the basis of race or gender. Second, Plaintiff has failed to exhaust her remedies on the disparate impact claim. Her EEOC charge is facially about disparate treatment, and she identified no neutral employment policy. Accordingly, Plaintiff's Title VII claims are dismissed.

40

### 2. Disparate Treatment Claim

#### a. Standard

The Fifth Circuit has explained

The Title VII inquiry is whether the defendant intentionally discriminated against the plaintiff. [When there is no direct evidence of discrimination, claims are] analyzed using the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this framework, a plaintiff must first create a presumption of intentional discrimination by establishing a prima facie case. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. The burden on the employer at this stage "is one of production, not persuasion; it 'can involve no credibility assessment.' " If the employer sustains its burden, the prima facie case is dissolved, and the burden shifts back to the plaintiff to establish either: (1) that the employer's proffered reason is not true but is instead a pretext for discrimination; or (2) that the employer's reason, while true, is not the only reason for its conduct, and another "motivating factor" is the plaintiff's protected characteristic.

*Alvarado v. Texas Rangers*, 492 F.3d 605, 611 (5th Cir. 2007) (citations omitted).

#### b. Parties' Arguments

In its memorandum in support, Defendant begins by noting that the ADEA and Title VII *prima facie* burden are similar but that, under Title VII, a plaintiff must prove only that race or gender was a "motivating factor." Defendant then focuses on the *prima facie* requirements. Defendant argues that the Plaintiff is not qualified and thus fails this first part of the *McDonnell Douglas* analysis. Defendant concludes, "For these reasons, plaintiff cannot establish a *prima facie* case, let alone carry her burden of proof of race- or gender-based discrimination under Title VII."

Plaintiff responds that she has made her *prima facie* showing. As to the race claim, Plaintiff submits two additional pieces of evidence. First, Plaintiff notes in her declaration that Delarious O. Stewart was a Black Male with a PhD from Jackson State University in 2012. (Doc.

75-2 at 284, 301.)  To support this, Plaintiff attaches to her declaration what she purports to be copy of Stewart's 2015 resume. (Pl. Ex. 5, Doc. 75-2 at 298.)[13]

Second, Plaintiff also declares that, from 2009 to 2013, there were 14,442 employees at its highest number at ULM, and, of this number, only three (3) black persons ever reached an Executive level position at ULM and never a black female. (Doc. 75-2 at 284.)

Plaintiff relies on a statistical report attached to her declaration (*Id.* at 302).  The meaning of the statistical report is unclear.  It appears to list the number of individuals that served in Executive or Administrative functions in the Fall 2010, 2011, and 2012, semesters (or perhaps years?), but without any further testimony explaining its contents, the Court cannot be sure. Assuming that it does list the total number of Executive or Administrators, the report provides that, in Fall 2012, there were 41 individuals with the EEOC Code Exec/Admin, of which 2 were African-American.  In Fall 2011, there were 26, of which 2 were non-white.  In Fall 2010, there were 64, of which 5 were non-white.

As to the claim of gender discrimination, Plaintiff merely states that Defendant has not articulated any nondiscriminatory reasons, so there is no need to produce evidence of pretext. Plaintiff produces no evidence to support her claim.

### c.  Analysis

For the reasons articulated above, the Court finds that the Plaintiff has made out a prima facie case of discrimination.  Thus, the next questions are nondiscriminatory reasons and pretext.

The Court rejects the Plaintiff's argument that she needed to produce no evidence of pretext because the Defendant did not bring forward any evidence.  First, the Defendant clearly

---

[13] Plaintiff argues that Stewart's resume shows evidence of discrimination because Stewart, who had a doctorate, was coded on ULM documentation (Def. Ex. S, Doc. 63-1 at 115) as being "less qualified" than Hemed, who had "only a Master's degree" (Doc. 75 at 30).

laid out the nondiscriminatory reasons for Hemed's hire in the ADEA section of its brief.  The only fair reading of the Defendant's brief is that it intended for these arguments to apply equally to the Title VII claims.  Second, Plaintiff clearly recognized that pretext might be at issue; otherwise, she would not have submitted evidence of racial discrimination.  Accordingly, the Court will evaluate whether the Plaintiff has submitted evidence proving the final prong of the *McDonnell Douglas* analysis.

The gender claim is easily dispensed with.  Unlike the ADEA claim, where there was evidence of discriminatory remarks, the Plaintiff has only the fact that the graduate degree requirement changed and the prima facie case.  These are not enough, by themselves, for a reasonable juror to conclude that gender was a motivating factor or that there was pretext.

The claim of racial discrimination also fails.  While the Plaintiff attempts to support her claim with additional evidence (the 2015 resume and the statistical report), the Court agrees with the Defendant that they are not competent evidence.  Plaintiff does not establish how she knows that the resume or report is what it purports to be.  Plaintiff also attempts to attest in her declaration to the contents of these documents, but, again, there is no foundation for her knowledge.  Accordingly, the Court excludes these documents and finds the evidence incompetent.[14]

Without them, Plaintiff simply has no proof of racial discrimination, beyond the change in qualifications and the prima facie case.  This is not sufficient for a juror to conclude that Defendant's explanation was a pretext or that race was a motivating factor in the decision. Accordingly, summary judgment on this claim is denied.

---

[14] Defendant also objects to the use of Stewart's resume because it was not produced in discovery and because the resume (from 2015) is not the resume considered by the Defendant in 2012.  Plaintiff responds that the applicant received his doctorate in 2012 (the year Stewart applied), so the Defendant would be in possession of the 2012 resume with the relevant information.  Based on the above finding, the Court need not answer this much closer call.

Even if the Court were to consider this evidence in conjunction with new graduate degree requirement and the prima facie case, summary judgment would be appropriate.  The Court is persuaded by two cases in particular: *Ivy v. Oxford Municipal Separate School District*, 799 F. Supp. 2d 697, 702-03 (N.D. Miss. 2011) and *Ward v. Midwestern State University*, 217 F. App'x 325, 329 (5th Cir. 2007).

In *Ivy*, the court granted summary judgment and dismissed a discrimination claim despite statistical evidence of discrimination.  The Court explained:

> Statistical evidence may be used in a disparate treatment case "to show that an employer's justification for a discriminatory act is pretext." *Plemer v. Parsons–Gilbane*, 713 F.2d 1127, 1137 (5th Cir. 1983). However, the Supreme Court has made clear that "[t]he probative value of statistical evidence ultimately depends on all the surrounding facts, circumstances, and other evidence of discrimination." *Int'l Bd. of Teamsters v. United States*, 431 U.S. 324, 340, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).  Here, Plaintiff does not provide any "other evidence" of racial discrimination. Instead, Plaintiff again offers only a subjective belief that she was discriminated against.  . . .
>
> Given that Plaintiff has presented only unsubstantiated and conclusory allegations of race discrimination, her statement that Defendant employs a low number of African Americans does not in itself show pretext. *See Deloach v. Delchamps, Inc.*, 897 F.2d 815, 818–20 (5th Cir. 1990) (only when coupled with other evidence contradicting employer's reason was statistical evidence probative of pretext). In other words, while statistical evidence could be relevant in this case, bare allegations and numbers alone without more context provided are not sufficient. *See* [*Ward v. Midwestern State University*, 217 F. App'x 325, 329 (5th Cir. 2007)] (finding that plaintiff's allegations that there were only four African–American faculty out of approximately 500 faculty members and that another African–American faculty member was denied tenure failed to establish pretext, as the plaintiff "fail [ed] to present any particularized evidence to support the[ ] allegations"); *Baker v. Randstad North America, L.P.*, 151 Fed.Appx. 314, 320 (5th Cir. 2005) (finding that "it is extraordinarily rare that raw numbers can insulate a plaintiff from summary judgment"); *E.E.O.C. v. Tex. Instruments, Inc.*, 100 F.3d 1173, 1185–86 (5th Cir. 1996) (affirming the district court's order granting summary judgment to the employer and rejecting the plaintiff's contention that statistical evidence was probative of pretext).

*Ivy*, 799 F. Supp.2d at 703.

Similarly, in *Ward v. Midwestern State University*, 217 F. App'x 325, 329 (5th Cir. 2007), a Plaintiff alleged discrimination when he was removed from a coordinator position, denied tenure, and denied a renewal of his teaching contract. *Id.* at 326.  In affirming the granting of summary judgment, the Court rejected the Plaintiff's statistical evidence "that there were only four African–American faculty out of approximately 500 MSU faculty members." *Id.* at 329. The Court also rejected plaintiff's argument that "another African-American faculty member . . . was denied tenure." *Id.*  The Fifth Circuit explained that the Plaintiff relied solely on his "speculative deposition testimony" and that he "fail[ed] to present any particularized evidence to support these allegations." *Id.*

The Court finds *Ivy* and *Ward* persuasive.  Similar to *Ward*, Plaintiff claims that another, more qualified African-American (Stewart) was rejected for the position, but this is speculative. The only thing Plaintiff points to is the fact that Stewart has a doctorate, but this alone does not show superior qualification.  Indeed, this is the entire premise of the Plaintiff's case.  Without more, the Plaintiff has failed to present sufficient evidence from which a juror could find pretext.

As to the statistical evidence, this too is insufficient.  As stated in *Ivy,* "while statistical evidence could be relevant in this case, bare allegations and numbers alone without more context provided are not sufficient."  799 F. Supp. 2d at 703.  Even assuming that this evidence were competent and demonstrated that a low number of non-white applicants were hired in Executive level positions, Plaintiff has provided no context or detail about any of these statistics. Moreover, given the lack of probative value of the resume, this appears to be another case where statistical evidence, without more, is insufficient, particularly since it is "extraordinarily rare that raw numbers can insulate a plaintiff from summary judgment." *Id.* (citation omitted).

In sum, the Court dismisses the Plaintiff's Title VII claims.  Construing the Defendant's brief fairly, it sufficiently demonstrated nondiscriminatory reasons such that the burden shifted to the Plaintiff to prove pretext.  Plaintiff has brought forward no evidence of gender discrimination.  Plaintiff's evidence of racial discrimination is incompetent.  But even if it were admissible, her evidence is "not so persuasive as to support an inference that the reason for Plaintiff's [lack of a promotion] was discrimination." *Ivy*, 799 F. Supp. 2d at 703 (citations and quotations omitted). Accordingly, summary judgment on the Title VII disparate treatment claims is granted, and these claims are dismissed with prejudice.

### 3. Disparate Impact Claims

Defendant argues that Plaintiff has failed to exhaust her remedies with respect to her claims for disparate impact.  Without much analysis, Plaintiff contends that she has.  The Court agrees with Defendant and finds that the disparate impact claim was not properly exhausted.

The Fifth Circuit has explained:

Section 717 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16(c), permits most federal employees to seek relief from proscribed discriminatory employment practices in Federal District Court. As a precondition to seeking this judicial relief, however, complaining employees must exhaust their administrative remedies by filing a charge of discrimination with the EEO division of their agency. *Brown v. General Servs. Admin.,* 425 U.S. 820, 96 S.Ct. 1961, 1967–68, 48 L.Ed.2d 402 (1976); *Martinez v. Dep't. of U.S. Army,* 317 F.3d 511 (5th Cir. 2003); 29 C.F.R. § 1614.105–107 (2005). . . .

The scope of the exhaustion requirement has been defined in light of two competing Title VII policies that it furthers. On the one hand, because "the provisions of Title VII were not designed for the sophisticated," and because most complaints are initiated pro se, the scope of an EEOC complaint should be construed liberally. *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 463 (5th Cir. 1970); *Fellows v. Universal Restaurants, Inc.,* 701 F.2d 447, 451 (5th Cir. 1983). On the other hand, a primary purpose of Title VII is to trigger the investigatory and conciliatory procedures of the EEOC, in attempt to achieve non-judicial resolution of employment discrimination claims. *Id.* at 466. Indeed, "[a] *less* exacting rule would also circumvent the statutory scheme, since Title VII clearly contemplates that no issue will be the subject of a civil action until the EEOC has

first had the opportunity to attempt to obtain voluntary compliance." *Sanchez,* 431 F.2d at 467. *See also Ong v. Cleland,* 642 F.2d 316, 319 (9th Cir. 1981) ( "[a]llowing a federal court complaint to proceed despite its loose 'fit' with the administrative charge and investigation ... is precluded if it would circumvent ... agency efforts to secure voluntary compliance before a civil action is instituted."). With that balance in mind, this court interprets what is properly embraced in review of a Title–VII claim somewhat broadly, not solely by the scope of the administrative charge itself, but by the scope of the EEOC investigation which "can reasonably be expected to grow out of the charge of discrimination." *Sanchez,* 431 F.2d at 466. We engage in fact-intensive analysis of the statement given by the plaintiff in the administrative charge, and look slightly beyond its four corners, to its substance rather than its label. *Fellows,* 701 F.2d at 451; *Fine v. GAF Chemical Corp.,* 995 F.2d 576, 578 (5th Cir. 1993); *Ong,* 642 F.2d at 319.[9]

*Pacheco*, 448 F.3d at 787-89.

In *Pacheco*, the Fifth Circuit affirmed the dismissal of a disparate impact claim. In evaluating the Plaintiff's charge, the Fifth Circuit found that "a review of the prima facie case for disparate impact is relevant. A disparate-impact plaintiff must show (1) a facially neutral policy; (2) that, in fact, has a disproportionately adverse effect on a protected class. Furthermore, proof of discriminatory motive is not required for disparate-impact claims." *Id.* at 791.  The Court concluded that, "On its face, [Plaintiff's] administrative charge allege[d] none of the elements of disparate impact. Instead, it is facially a disparate-treatment claim . . .  alleging that he was singled out for intentional discrimination because of his race." *Id.* at 791.  The appellate court also noted that, "in particular," the charge "fail[ed] to identify any neutral employment policy that would form the basis of a disparate-impact claim" and that "[a] neutral employment policy is the cornerstone of any EEO disparate-impact investigation, since the EEO must evaluate both the policy's effects on protected classes and any business justifications for the policy." *Id.* at 792.  The Fifth Circuit concluded:

> "In this case, we hold that a disparate-impact investigation could not reasonably have been expected to grow out of [plaintiff's] administrative charge because of the following matters taken together: (1) it facially alleged disparate treatment; (2)

it identified no neutral employment policy; and (3) it complained of past incidents of disparate treatment only

*Id.*

*Pacheco* is directly on point.  Here Plaintiff complained in her EEOC charge:

I began my employment with University of Louisiana @Monroe [sic] on January 7, 2008, most recently as a Program/Data Analyst earning $38,625 annually.  On January 8, 2013, I was denied the Executive Director's position, which I was qualified for.  I was told by Stephen Richters, Executive Vice President, that younger folks on campus should be considered for pay raises/promotions first.  On February 5, 2013 and March 27, 2013, I filed retaliation complaints with the human resources department.  The company employs over 500 persons.

According to Mr. Richters, I was not selected for the position because he wanted someone with a graduate degree.

I believe I have been discriminated against based on my race, Black; sex, Female; age, 53 years; and retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended and The Age Discrimination in Employment Act of 1967, in that, Ruslan Hemed, White-male 27 years of age with no experience was selected for the position and I was instructed to train him.

(Doc. 75-2 at 274.)  As in *Pacheco*, Plaintiff (1) facially alleged disparate treatment, (2) identified no neutral employment policy, and (3) complained of no past incidents of disparate impact.

Thus, even looking at the substance rather than the form of the EEOC charge, a disparate impact claim "can[not] reasonably be expected to grow out of the charge of discrimination."  Accordingly, summary judgment on this issue is granted, and the Title VII disparate impact claim is dismissed without prejudice.

### C.  ADEA Retaliation

#### 1. Retaliation Generally

In *Feist v. Louisiana, Department of Justice, Office of the Attorney General*, 730 F.3d 450 (5th Cir. 2013), the Fifth Circuit explained:

> To establish a prima facie case of retaliation under the ADA or Title VII, a
> plaintiff must show that (1) she participated in an activity protected under the
> statute; (2) her employer took an adverse employment action against her; and (3)
> a causal connection exists between the protected activity and the adverse action.
> *McCoy v. City of Shreveport,* 492 F.3d 551, 556–57 (5th Cir. 2007) (Title VII);
> *Seaman v. CSPH, Inc.,* 179 F.3d 297, 301 (5th Cir. 1999) (ADA). "If the
> employee establishes a prima facie case, the burden shifts to the employer to state
> a legitimate, non-retaliatory reason for its decision. After the employer states its
> reason, the burden shifts back to the employee to demonstrate that the employer's
> reason is actually a pretext for retaliation," *LeMaire v. Louisiana,* 480 F.3d 383,
> 388–89 (5th Cir. 2007) (internal citation omitted), which the employee
> accomplishes by showing that the adverse action would not have occurred "but
> for" the employer's retaliatory motive, *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* ——
> U.S. ——, 133 S.Ct. 2517, 2533, 186 L.Ed.2d 503 (2013) (Title VII); *Seaman,*
> 179 F.3d at 301 (ADA).

*Id.* at 454.

Preliminarily, the Court notes that the Defendant focuses solely on the *prima facie* requirements for retaliation and does not argue any non-discriminatory reasons for the transfer. Unlike above, where it was reasonable to infer from the ADEA analysis that the Defendant also argued nondiscriminatory reasons under Title VII for the same action (Hemed's hire), no such inference is warranted here for the different actions. Accordingly, the Court will focus solely on whether the Plaintiff made a prima facie showing of retaliation.

## 2. Parties' Arguments

Defendant argues that Plaintiff failed to satisfy its prima facie case as to any of the alleged retaliatory claims. First, Defendant argues that the following do not rise to the level of adverse employment actions: 1) Hemed's locking his doors, 2) Hemed's request to provide a list of job duties, 3) Hemed's inquiries about her job; and 4) Hemed's CC'ing the Vice-President of ULM on one of these inquiries. Second, Defendant argues that the transfer to the Computing Center 1) was not exhausted and therefore not properly before the court; 2) was merely a lateral transfer that was not an adverse employment decision, and 3) even if it were an adverse

49

employment action, lacked a causal connection between the protected activity (her original complaint of age discrimination) and this action.

Plaintiff asserts that she has satisfied her prima facie case of retaliation.  As to the first set of allegations, Plaintiff claims these actions are retaliatory.  As to the second, Plaintiff claims that she exhausted her remedies because she filed an EEOC charge alleging discrimination and therefore did not need to file an additional EEOC charge alleging retaliation.  As to the substance of the claim, Plaintiff states that she suffered a *de facto* demotion by being given nothing to do and/or menial tasks.  Finally, the transfer to the Computing Center occurred one or two months after she filed her EEOC charge, so there is a sufficient causal connection.

### 3. Adverse Employment Action Standard

The Supreme Court has explained that, to demonstrate retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006) (citations omitted).  The high court referred to "*material* adversity" because:

> An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. . . . The antiretaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence.

*Id.* (citations omitted).  The Supreme Court referred to a "*reasonable* employee" because "the provision's standard for judging harm must be objective." *Id.*  The standard is set forth in

"general terms because the significance of any given act of retaliation will often depend upon the particular circumstances.  Context matters." *Id.*, 548 U.S. at 69, 126 S. Ct. at 2415.

### 4. Locked Doors

Both parties seem to agree that Hemed would lock the door to his personnel office. (*See* Doc. 60-2, 75-1.)  Beyond that, the parties disagree. Nevertheless, construing the facts in a light most favorable to the Plaintiff, the Court still finds that this would not dissuade a reasonable employee from making or supporting a charge of discrimination.

Plaintiff contends that "Hemed deliberately excluded Ms. Mitchell from performing her job and access to her work site." (Doc. 75-1 at 4.)  To support this, Plaintiff point to some of Hemed's deposition.  There he stated that they had two printers and that, if one did not work, then Plaintiff could not print to the other one. (Doc. 75-2 at 321.) She also could not fax. (*Id.* at 321-22.)  Hemed said that printing reports is part of her job and that, without a printer, "it'll be difficult to do some – complete some tasks." (*Id.*)

Plaintiff also provides her own deposition testimony.  Plaintiff states that she complained because "a lot of our material is in the common area of his office . . . [i]n his office area." (Doc. 75-2 at 47.)  Hemed's office contained "bookcases that contained the data and research materials we used" and the copy machine. (*Id.* at 49.)  Plaintiff also stated that a storage area was locked. (*Id.* at 48.)  According to Plaintiff, the locking began January 28, and she filed her complaint February 5. (*Id.* at 56.)  Plaintiff testified, "We had never locked offices – office doors in our area before. . . . We – we both – all use the same material.  There's nothing secure." (*Id.* at 51-52.)  Plaintiff stated:

Q: Now, what did you need that was in that office that you needed to perform your job duties?

A: There was – the copier was in there, the one that we use for all the information that we use to distribute to other people, and we had a lot of surveys and research material in binders in there . . . If someone needed it, I did not have access to it.

(*Id.* at 53.)

It should be noted, however, that Plaintiff admitted that she did not request to Hemed or anyone else, outside of her complaint, that the equipment and materials be made available to her. (*Id.* at 54.)  She also did not request a key. (*Id.* at 55.) Plaintiff also testified that Hemed offered a key and stopped locking his personal office, though only after Mitchell filed her complaint. (*Id.* at 50.)

Defendant also points to Hemed's deposition testimony.  There, Hemed said he would sometimes lock the door on purpose and sometimes lock it by accident. (Doc. 63-1 at 153.) Hemed testified that it was never his intention to limit her access to his office and that he did not realize she felt that way. (*Id.*).  After about two or three months, Plaintiff approached Hemed and told him, "You're locking the door and I can't get in your office, and sometimes I need to get in your office." (*Id.*)  Hemed replied that he did not realize she needed access or that he was locking his door. (*Id.*)  Hemed offered to give her a key and to refrain from locking his office.  (*Id.*). Hemed said Plaintiff declined a key. (*Id.*)  Afterword, Hemed made sure she had access to his office if she needed it. (*Id.*) Hemed testified that no one instructed him to take measures to keep Plaintiff out of his personal office.  Further, Hemed testified that, prior to this conversation, he was not aware that she filed an EEOC charge or complaint. (Doc. 63-1 at 165.)

Reviewing these facts and construing them in a light most favorable to the Plaintiff, the Court grants summary judgment on this retaliation claim.  Hemed directly stated, and Plaintiff implicitly acknowledged, that there were two printers.  Thus, Plaintiff was ultimately only deprived access to the fax machine and "data and research materials."  Significantly, there

appears to have been less than two weeks between when the door-locking started and when Plaintiff complained, and Plaintiff does not seriously contest that, as soon as the problem was brought to Hemed's attention, he offered to remedy the issue.  Finally, Plaintiff herself admitted that she never requested that anyone provide her access to the equipment and materials prior to filing the complaint.

Based on these facts, no reasonable juror would conclude that a reasonable employee would be dissuaded a reasonable employee from pursuing or making a complaint.  This is, at best, a minor annoyance.  Accordingly, summary judgment on this claim is granted.

### 5. Requests for Job Duties, Inquiries about the Job, and CC'ing Vice President

Regarding the request for a list of job duties, inquiries about the job, and CC'ing the Vice President on one request, the Court also finds that summary judgment is appropriate.  The evidence shows that, on February 1, 2013, Hemed sent Plaintiff an email requesting a list of her job duties. (Doc. 75-2 at 58-59, 60-2 at 5.)  Plaintiff testified that he said he wanted it by the end of the week. (Doc. 75-2 at 60.)  She filed a complaint four days later. (Doc. 75-2 at 59-61.)

On March 6, 2013, almost a month after Plaintiff filed her February 5 complaint, Hemed sent Plaintiff an email requesting a list of projects and reports that she was responsible for throughout the year. (Doc. 75-2 at 62.)  Hemed claimed he was "trying to just kind of sort out what's the daily life of the office and what's the annual process of what things [they had] to submit [and] . . . to work on" (Doc. 63-1 at 157-58.) Hemed thought "no one else but Ms. Mitchell would know that better than anybody else." (Doc. 63-1 at 158.)  Hemed testified that it took a couple of requests for Plaintiff to give him the information and that she was very upset that he carbon copied Dr. Richters in one of the requests. (Doc. 63-1 at 159-60.)

Plaintiff told Hemed to get the information from Dr. Pani. (Doc. 75-2 at 63-64.)  She said

that this, and the request for information concerning ad hoc reports, was "another reason they

were going to figure out a way to get rid of me.  . . . [T]he information that I had to give him was

already common knowledge." (Doc. 75-2 at 57.)  She testified, "The process that was being

handled with it, the way Fred was contacting Dr. Richters and all the things that were happening

behind it . . .  I had reason to be fearful and to file this complaint." (Doc. 75-2 at 61.)  Plaintiff

claims that she provided all requested information to Hemed, though she testified that she did so

at least a month later on March 12. (*See* Doc. 75-2 at 67.)[15]

Simply put, no reasonable juror would conclude that any of Defendant's actions here

would dissuade a reasonable employee from making or supporting an EEOC claim.  Even

construing the facts in a light most favorable to the Plaintiff, Hemed's actions seem, at worst,

like "minor annoyances" and "petty slights," and, in reality, more like completely reasonable

actions given the Plaintiff's conduct in not providing the list of job duties.  Summary judgment

on these claims is appropriate, and they are dismissed with prejudice.

### 6. Transfer to the Computing Center

#### a.  Exhaustion of Remedies

The first issue is whether Plaintiff properly exhausted her claim for retaliation for the

transfer to the Computing Center.  In short, Defendant argues that Plaintiff filed her EEOC

charge in June 2013 and that Plaintiff was transferred in July 2013.  Thus, Plaintiff never filed a

second EEOC charge encompassing the July 2013 retaliation claim.  Plaintiff responds that,

because this was a claim for retaliation, no subsequent EEOC charge was necessary.

---

[15] Plaintiff claims that Richters had already received a description of her job duties from Justin Roy on November 20, 2008 (Doc. 63-2 at 97-98), but this is a description of the Executive Director duties, not Plaintiff's position. (*Id.*)

The Court agrees with the Plaintiff.  In *Gupta v. East Texas State University*, 654 F.2d 411 (5th Cir. 1981), an instructor filed an EEOC charge claiming discrimination, filed a second charge claiming various acts of retaliation for the first charge, and then filed suit.   *Id.* at 412-413. He was subsequently informed that his teaching contract would not be renewed, so he claimed in his lawsuit another instance of retaliation by termination. *Id.* at 413.  However, he did not file another EEOC charge. *Id.*  The Court concluded:

> [W]e hold that it is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge; the district court has ancillary jurisdiction to hear such a claim when it grows out of an administrative charge that is properly before the court.
>
> There are strong practical reasons and policy justifications for this conclusion. It is the nature of retaliation claims that they arise after the filing of the EEOC charge. Requiring prior resort to the EEOC would mean that two charges would have to be filed in a retaliation case a double filing that would serve no purpose except to create additional procedural technicalities when a single filing would comply with the intent of Title VII.

*Id.* at 414.

Defendant argues that *Gupta* is inapplicable under *Simmons-Myers v. Caesars Entertainment Corp.*, 515 F. App'x 269 (5th Cir.), *cert denied,* 134 S. Ct. 117, 187 L. Ed.2d 36 (2013).  In *Simmons-Myers*, an employee filed an EEOC charge claiming discrimination based on sex in a variety of ways, such as taking other employees to dinner and imposing a different set of sales goals. *Id.* at 271.  Plaintiff was subsequently terminated, yet she failed to file a second charge of discrimination related to the termination prior to filing suit.  The Court dismissed the gender discrimination and relation claim arising out of her termination without prejudice. *Id.* at 273.  The Court explained, "Her termination was a separate employment event for which [Plaintiff] was required to file a supplemental claim, or at the very least, amend her original

EEOC charge." *Id.* (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)).

The Fifth Circuit also declined to apply *Gupta*. The court first noted that *Gupta* may not have survived *Morgan*, noted that "[o]ur sister circuits appear to be split on this issue," and declined to resolve the question:

> We note that *Gupta* may no longer be applicable after the Supreme Court's decision in *Morgan,* 536 U.S. 101, 122 S.Ct. 2061. Our sister circuits appear to be split on this issue. *See, e.g., Martinez v. Potter,* 347 F.3d 1208, 1211 (10th Cir. 2003) (abolishing a *Gupta*-like exception). *But see Jones v. Calvert Grp., Ltd.,* 551 F.3d 297, 303 (4th Cir. 2009) (holding that *Morgan* did not abolish a *Gupta*-like exception); *Wedow v. City of Kan. City, Mo.,* 442 F.3d 661, 672–76 (8th Cir. 2006) (holding that a narrow exhaustion requirement remains); *Delisle v. Brimfield Twp. Police Dep't.,* 94 Fed.Appx. 247, 252 (6th Cir. 2004) (same); *Fentress v. Potter,* No. 09 C 2231, 2012 WL 1577504, at *2 (N.D.Ill. May 4, 2012) ("Given these post-*Morgan* tea leaves from the Seventh Circuit, as well as the three-to-one circuit split against abrogation, the court concludes that the exception remains valid."); *Gordon v. Bay Area Air Quality Mgmt. Dist.,* No. C08–3630 BZ, 2010 WL 367781, at *1 (N.D.Cal. Jan. 27, 2010) ("The Ninth Circuit authority that has interpreted [a *Gupta*-like exception] in light of *Morgan* has [found it to still be applicable]."). *See also Weber v. Battista,* 494 F.3d 179, 182–84 (D.C.Cir. 2007) (discussing other circuits' treatment of the issue). We need not answer this question today.

*Id.* at 273 n. 1. The Court then concluded that the gender discrimination and retaliation claims should be dismissed without prejudice for failure to exhaust:

> But this court has not applied the *Gupta* exception to claims in which both retaliation and discrimination are alleged. *See Gupta,* 654 F.2d at 414 (creating exception for a claim involving only retaliation "growing out of an earlier charge," not a retaliation and discrimination claim simultaneously alleged); *see also Scott v. Univ. of Miss.,* 148 F.3d 493, 514 (5th Cir. 1998) (holding that *Gupta* "is limited to retaliation claims due to the special nature of such claims"), *abrogated on other grounds by Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000); *Sapp v. Potter,* 413 Fed.Appx. 750, 752–53 (5th Cir. 2011) ("Because the *Gupta* exception is premised on avoiding procedural technicalities, it has only been applied to retaliation claims alone [and not] claims in which both retaliation and discrimination are alleged."). Otherwise, [plaintiff] would be required to return to the EEOC and exhaust her administrative remedies with respect to her discrimination claim, while proceeding with litigation on her retaliation claim. Permitting simultaneous proceedings such as these for the same inciting event would "thwart the administrative process and

peremptorily substitute litigation for conciliation." *McClain v. Lufkin Indus., Inc.,*
519 F.3d 264, 273 (5th Cir. 2008); *see also Sapp,* 413 Fed.Appx. at 753.

*Id.* at 273-74.

The Court finds *Simmons-Myers* distinguishable.  There, the Fifth Circuit found that the
Plaintiff had not exhausted retaliation *and* discrimination claims.  Here, the only issue is whether
Plaintiff exhausted her remedies for *retaliation*; Plaintiff does not claim that the transfer was due
to disparate treatment *and* due to retaliation.  Thus, *Gupta* is squarely on point.

Additionally, while neither party raised the issue, the Court notes that "*Gupta* and its
rationale are not applicable when . . . the alleged retaliation occurs *before* the filing of the EEOC
charge." *Eberle v. Gonzales*, 240 F. App'x 622, 628 (5th Cir. 2007).  However, the Court finds
that this exception is inapplicable here.  Plaintiff filed her EEOC charge, at the latest, on June 12,
2013.  Defendant admits in its Statement of Uncontested Fact that Plaintiff was not actually
moved to the Computing Center until July 1, 2013. (Doc. 60-2 at 9.)[16]  As a result, the adverse
employment action did not occur until *after* the EEOC charge was made.  More importantly, as
will be discussed at length below, Plaintiff argues that she was retaliated because, though her job
description remained unchanged on paper, she was stripped of duties and job responsibilities.
None of these consequences of the move would have manifested themselves to Plaintiff until

---

[16] Specifically, the Statement of Uncontested Facts provides, "On July 1, 2013, Plaintiff was transferred to the
Computing Center . . ." (Doc. 60-2 at 9.)  The Court notes that this also appears to conflict with Plaintiff's
deposition testimony.  As discussed above, on June 10, 2013, Epinnette allegedly told her that the job was ready and
that she would move the next day. (Doc. 75-2 at 89.)  Plaintiff asked for the terms to be laid out in writing. (*Id.*)
Epinnette gave her a document and told her she would have to sign it – "it didn't matter one way or the other, but I
was going to have to sign it." (Id. at 90.)  Plaintiff reviewed the document but did not agree with its terms. (*Id.*)
Nevertheless, the Court is again required to construe the facts in a light most favorable to the Plaintiff.  Doing so, the
Court accepts as true Defendant's admission rather than Plaintiff's testimony – the transfer did not happen until July
1.

after the move took place.  Thus, the retaliatory action occurred *after* the filing of the EEOC

charge, and *Eberle* does not bar Plaintiff's claim.[17]

In sum, while *Gupta* has been called into question, it remains good law.  It has never been

overruled and has, as demonstrated above, been applied by several circuit courts.  "[U]ntil the

Supreme Court or Fifth Circuit reassess the holding in *Gupta*, this Court is bound to follow its

holding." *See Finnie v. Lee Cty., Miss.*, 907 F. Supp. 2d 750, 786-88 (N.D. Miss. 2012)

(collecting cases and applying *Gupta* after *Morgan*).  Further, *Gupta*'s exception from *Eberle* is

inapplicable.  Accordingly, the Court will apply *Gupta* and find that Plaintiff properly exhausted

her administrative remedies for the move to the Computing Center.

### b.  Adverse Employment Action

Again, "[a]n adverse employment action is one that a reasonable employee would find to

be "materially adverse," i.e., one that might "dissuade a reasonable worker from making or

supporting a charge of discrimination" under Title VII." *Sabzevari v. Reliable Life Ins. Co.*, 264

F. App'x 392, 396 (5th Cir. 2008).  "Under the 'materially adverse' standard, 'a transfer that

does not involve a demotion in form or substance cannot rise to the level of a materially adverse

employment action.' " *Id.* (affirming granting of summary judgment and finding no evidence that

transfer was anything but a lateral transfer in terms of "pay, promotional opportunities, working

conditions, and other objective factors") (citations omitted).  Moreover, an employee's subjective

---

[17] The Court further notes that Plaintiff's work journal (parts of which were submitted by both parties but which was likely not properly authenticated by either) confirms this finding.  On the one hand, Plaintiff stated in her work journal that that she was notified by Hemed and Eppinette of the impending move to the work center on June 10 and 11, 2013.  This suggests that she had notice of the move before the filing of the EEOC charge.  However, on the other, stronger hand, Plaintiff says in the June 11 work journal entry that she believed the move was retaliation and that "Richters was sending [Eppinette] here to convince [her] to move."  (Doc. 75-2 at 225.)  Thus, the work journal clearly reflects that, as of June 11, Plaintiff did not believe the move to the Computing Center was an absolute certainty and that she would have some influence on whether it would happen. Moreover, Plaintiff's statement is not hearsay, as it is being offered to reflect her belief at the time, not the truth of the matter asserted.  Thus, if the work journal had been properly authenticated, it would have supported the Court's finding.

preference for a different position cannot make her transfer a materially adverse action; the standard is objective. *See Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 485 (5th Cir. 2008) (citation omitted).

Nevertheless, "a lateral reassignment to a position with equal pay could amount to a materially adverse action in some circumstances." *See id.; see also Kessler v. Westchester City Department of Social Services*., 461 F.3d 199, 209-10 (2d Cir. 2006) (reversing granting of summary judgment and finding sufficient evidence of adverse employment action when employee, upon transfer, was no longer given managerial assignments, not allowed to attend meetings of lower-level managers, supervised no one, and "was required to undertake clerical tasks and to perform data entry alongside employees several grades below his."); *Matthews v. City of W. Point, Miss*., 863 F. Supp. 2d 572, 596-97 (N.D. Miss. 2012) (finding issue of fact as to whether plaintiff was demoted despite there being no affect to his title, rank, and pay, and noting that "a transfer to a different position can be 'adverse' if it involves a reduction in pay, prestige, *or* responsibility" (citation omitted, emphasis in original)).

Summary judgment on this claim is not warranted. Construing the facts in a light most favorable to the Plaintiff, a reasonable juror could conclude that her transfer to the Computing Center was a *de facto* demotion.

Preliminarily, the Court notes that the primary evidence relied upon by the Defendant is the fact that, on paper, Plaintiff's job duties have not changed. This is unpersuasive.

Indeed, *Burlington* rejected a similar argument. There, the employer claimed that the employee's reassignment of job duties was not an adverse employment action because "both the former and present duties fall within the same job description." *Burlington*, 548 U.S. at 70, 126 S. Ct. at 2416. In rejecting the argument and affirming the jury's finding of retaliation, the Court

focused on "all the circumstances," including the "considerable evidence" of how the new job duties were "more arduous and dirtier," how the old job duties carried greater prestige, and how the old duties were "objectively considered a better job." *Id.*, 548 U.S. at 71, 126 S. Ct. at 2417. Thus, the fact that, on paper, the Plaintiff's job duties remained the same does not entitle Defendant to summary judgment.

Turning to the Plaintiff's evidence, she has demonstrated that she was stripped of her job duties and given reduced responsibilities. This is clear from her deposition, her declaration, and her audio recording.

In her deposition, Plaintiff testified that she was forced to perform menial, degrading duties such as "forms, which was the clerical, the secretary's duties. . . . As opposed to being in a position to advance to a higher level, now I'm doing things that are even below me, below the programmer analyst duties." (Doc. 75-2 at 106.) Plaintiff was "just modifying the documents[,] . . . not creating new ones. . . . That's the skill set a secretary normally has." (*Id.* at 107.) She also "started doing help desk functions." (*Id.* at 108.) Plaintiff also testified that she would attend training but be unable to use the experience for lack of assignments; so far, "there hasn't been a need" for her. (Doc. 75-2 at 109-10.) Plaintiff testified, "even if I go and get the training, which I have, they're not calling me back to come help them because they don't need it." (*Id.* at 112.)

Moreover, in her declaration, Plaintiff attests that "requests that I previously completed [in the UPA Office] are now being sent to the computing center and are forwarded to other programmers. This leaves me with nothing to do for weeks." (Doc. 75-2 at 281-82.)

Though the summary of the reporting ticket information is inconclusive, Plaintiff's declaration also describes seven "one-off" projects from October 2013 to May 2015. In short,

construing the evidence in a light most favorable to the Plaintiff, these provide specific examples of menial, dead-end projects that amounted to nothing in the long term.

Finally, as detailed above, Plaintiff's audio recording (Pl. Ex. 7, Doc. 75-2 at 306, Oral Recording 2014 08 28 CC) further reflects that Plaintiff lost her job responsibilities and duties. A reasonable juror could easily infer from this recording (1) that Plaintiff's boss observed that "the reporting aspect has not grown the way [they] thought it would grow (*Id.* at 3:49 – 4:51); (2) that her boss acknowledged that she had nothing to do (*Id.*) and (2) that, according to the boss, she "sort of fell to the wayside." (*Id.* at 21:12.)

The Court recognizes that, as Defendant contends, Plaintiff's story has arguably changed; she initially complained of being given more work, and, now, she maintains that she was given nothing to do. The Defendant can cross-exam the Plaintiff on this inconsistency at trial. For present purposes, the Court must construe Plaintiff's evidence in a light most favorable to her.

In sum, Plaintiff has established an issue of fact demonstrating that, though her pay and job description remained the same, she suffered a *de facto* demotion by being stripped of all meaningful job duties and responsibilities. A reasonable juror could conclude that this would dissuade a reasonable employee from supporting or initiating an EEOC complaint. Summary judgment on this issue is not warranted.

### c.  Causation

Defendant contends that, even if the transfer to the Computing Center was an adverse employment action, Plaintiff failed to prove the final element of her *prima facie* case: that a "causal connection exists between the protected activity and the adverse action." *Feist*, 730 F.3d at 454 (citation omitted). Defendant argues that the protected activity here (the January 2013

complaint of age discrimination) was too far removed from the July 1, 2013, transfer to the

Computing Center to be causally related.

Plaintiff counters that the Defendant focuses solely on the earliest complaint rather than

her numerous other complaints, culminating in her May or June 2013 EEOC charge.  Thus,

Plaintiff contends there is a sufficient causal connection.

The Fifth Circuit has explained:

A plaintiff alleging retaliation may satisfy the causal connection element by
showing close timing between an employee's protected activity and an adverse
action against him.  Such temporal proximity must generally be very close. This
Court has found, for example, that a time lapse of up to four months may be
sufficiently close, while a five month lapse is not close enough without other
evidence of retaliation. Such evidence may include an employment record that
does not support dismissal, or an employer's departure from typical policies and
procedures.

*Id.* at 454-55 (citations, quotations, and alterations omitted).

The Court agrees with Plaintiff.  On June 12, 2013, Plaintiff submitted her EEOC charge

(Doc. 60-2 at 7.).  The Plaintiff's EEOC Intake Questionnaire is signed May 14, 2013. (Doc. 75-

2 at 279.)  By Defendant's own evidence, Eppinette told the Plaintiff via a June 25, 2013, letter

that, effective July 1, Plaintiff would be reassigned from Institutional Research to the Computing

Center.  (Doc. 63-2 at 54.)[18]  Thus, the time between the EEOC charge and the transfer is, at

most, two months, so they are sufficiently close to be causally related.

### 7. Summary

Summary judgment on the retaliation claim is granted in part and denied in part.  The

claims related to the locked doors, requests for job functions, inquiries about her job, and CC'ing

---

[18] While this document is arguably not properly authenticated, Defendant admitted to this fact through its Statement
of Uncontested Facts. (*See* Doc. 60-2 at 7 ("On June 25, 2013, Mr. Eppinette, presented Plaintiff with an
employment letter documenting that, effective July 1, 2013, Plaintiff would be assigned to a new reporting group
within the Computing Center . . .").)

the Vice President are dismissed with prejudice, for they are, at worst, mere annoyances or petty slights.  However, Plaintiff has raised a genuine issue of fact as to whether the transfer to the Computing Center was an adverse employment action and whether it was causally related to the protected act of filing her EEOC charge.  Thus, summary judgment on this claim is denied.

### D.  Louisiana Whistleblower Act

"Louisiana's Whistleblower Act forbids retaliation when [an] employee 'in good faith, and after advising the employer of the violation ..., [d]iscloses or threatens to disclose a workplace act or practice that is in violation of state law.' " *Herster v. Bd. of Supervisors of Louisiana State Univ.*, 72 F. Supp. 3d 627, 647 (M.D. La. 2014) (quoting La. Rev. Stat. § 23:967(A)). This Court has recognized that

> The Act has five elements: 1) a workplace act or practice violates state law, 2) the employee informed his employer of the violation of state law, 3) the employee disclosed or threatened to disclose the violation, 4) the employee suffered an adverse employment action, and 5) the adverse employment action was suffered as a result of his whistleblowing activity.

*Id.* (citation and quotation omitted).

Here, the Defendant places at issue the first and fourth element.  Specifically, Defendant claims that the Plaintiff has proven no violation of state law.  Further, Defendant states that Title VII retaliation analysis is applicable to the reprisal claim and that the Plaintiff has failed to prove that she suffered an adverse employment action.  Plaintiff claims that there are genuine issues of fact as to whether these elements are met.

Based on the above findings, the Court denies Defendant's motion for summary judgment on this claim.  As to the first issue, Plaintiff has raised an issue of fact that there has been an actual violation of state law.  La. Rev. Stat. § 23:301 provides in part, "It is unlawful for an employer to engage in any of the following practices: (1) Fail or refuse to hire, or to

discharge, any individual or otherwise discriminate against any individual with respect to his compensation, or his terms, conditions, or privileges of employment because of the individual's age." Louisiana courts look to federal case law for guidance when interpreting its age discrimination law and apply the *McDonnel Douglas* framework. *See LaBove v. Raftery*, 2000-1394 (La. 11/28/01), 802 So. 2d 566, 573.  Based on the above analysis, a reasonable juror could find disparate treatment in violation of Louisiana law in Defendant's failure to promote promote Plaintiff.

Similarly, Defendants concede that "This Court has consistently imposed the Title VII retaliation framework onto Louisiana Whistleblower reprisal claims." (Doc. 63 at 39, citations omitted).  Having found issues of fact with respect to the retaliation claim, the Court similarly denies summary judgment on the state law claim.

### V.     Conclusion

Accordingly**,**

**IT IS ORDERED** that the Motion for Summary Judgment (Doc. 60) filed by Defendant, University of Louisiana System is **GRANTED IN PART** and **DENIED IN PART**;

**IT IS FURTHER ORDERED** that Plaintiff's Title VII claims of disparate treatment with respect to gender and race are **DISMISSED WITH PREJUDICE**;

**IT IS FURTHER ORDERED** that Plaintiff's Title VII claim of disparate impact is **DISMISSED WITHOUT PREJUDICE**;

**IT IS FURTHER ORDERED** that, with respect to Plaintiff's retaliation claims of (1) Hemed locking his office door, (2) Hemed asking about Plaintiff's job and for a list of Plaintiff's duties, and (3) Hemed CC'ing the Vice President on one of these communications, such retaliation claims are **DISMISSED WITH PREJUDICE**; and

**IT IS FURTHER ORDERED** that, in all other respects, Defendant University of Louisiana System's Motion for Summary Judgment (Doc. 60) is **DENIED.**

Signed in Baton Rouge, Louisiana, on <u>December 30, 2015</u>.


_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**